SOUTHWIRE COMPANY,
Plaintiff-Appellant,

v.

TRANS–WORLD METALS & COMPANY, LTD., and Trans-World Metals, Inc., Defendants-Appellees.

Nos. 83–8391, 83–8546.

United States Court of Appeals,
Eleventh Circuit.

June 29, 1984.

James A. Bratton, Jr., John G. Despriet, Jane Childs Carr, Atlanta, Ga., for plaintiff-appellant.

Howard A. Rosenstein, New York City, for defendants-appellees.

Before GODBOLD, Chief Judge, HILL and THORNBERRY *, Circuit Judges.

GODBOLD, Chief Judge:

■ In this appeal we decide whether the Georgia long arm statute subjects the nonresident defendants to the jurisdiction of a Georgia court. Defendants came to Georgia to solicit sales of scrap aluminum to plaintiff. They returned to New York, and later, without coming back to Georgia, they entered by phone the contract here in dispute for sale to plaintiff of primary aluminum. Some months later defendants returned to Georgia to discuss the contract that had been made. We do not decide whether the pre-contract activity alone or the post-contract activity alone established jurisdiction. We hold that both activities in Georgia, when considered together and viewed in the context of defendants' prior extensive metal sales to plaintiff, confer jurisdiction under Georgia's long arm statute for suit on the contract. We reverse the district court's dismissal for lack of jurisdiction over the person.

## I. Background

Southwire is a Georgia corporation that manufactures aluminum products. Trans-World Metals & Co., Ltd. (Metals & Co., Ltd.) is a British company that trades in metals. Trans-World Metals, Inc. (Metals, Inc.), a New York corporation, acted as agent for Metals & Co., Ltd. in the United States.

Allen Snyder is president and a director of Metals, Inc. Both James Huff and Fred Morosco are vice-presidents and directors of the company. Snyder and Huff are aluminum traders for the company.

Southwire and defendants have an extensive prior course of dealing. Since 1977 Southwire has contracted on numerous occasions with Metals & Co., Ltd. through Metals, Inc. for the purchase of copper and aluminum. Against this backdrop, in February 1981 (two months before the April 7 contract at issue) Huff visited Southwire in Carrollton, Georgia, to solicit aluminum sales. The district court found that during that trip Huff and Campbell, the manager of Southwire's primary metals division, discussed only the sale of scrap aluminum. Southwire contended that primary aluminum, the subject of the April 7 contract at issue, was also discussed, but the district court resolved this credibility choice in favor of defendants.

Two months later, on April 3, 1981, Huff, of Metals, Inc., and Campbell, of Southwire, negotiated over the phone for the sale of 12,000 tons of primary aluminum to Southwire in 1982. The parties dispute, and the district court did not decide, who solicited whose business in this telephone exchange. Negotiations continued by phone until April 7, when the parties reached an oral agreement for the sale of primary aluminum from Metals & Co., Ltd. to Southwire. Southwire sent a confirmation contract to Metals & Co., Ltd. that contained a Georgia choice of law clause but that was never signed. Metals & Co., Ltd. later sent its own confirmation, which contained no choice of law clause.

Before delivery of the aluminum began, questions arose over the parties' responsibilities in performing the contract. Southwire alleged that defendants failed to provide a sufficient amount of aluminum in the January 1982 shipment and sought to cancel the contract. On February 16, 1982, at Southwire's invitation, Snyder and Mor-

* Honorable Homer Thornberry, U.S. Circuit Judge for the Fifth Circuit Court of Appeals, sitting by designation.

osco met with Southwire's employees at Southwire's facility in Carrollton, Georgia. At that meeting, the district court found, Southwire attempted "to dissuade the defendants from enforcing the contract." District court op. at 5.

Three weeks later Southwire filed this declaratory judgment action, alleging that defendants had failed to perform and seeking cancellation of the agreement. Defendants moved to dismiss for lack of personal jurisdiction. The district court concluded that Georgia's long arm statute as construed did not confer jurisdiction over Metals & Co., Ltd. and Metals, Inc. and dismissed the action. Southwire appeals.

## II. Defendants' activities and the reach of the Georgia long arm statute

■ In a diversity action a federal court can assert jurisdiction over a nonresident defendant only to the extent permitted by the long arm statute of the forum. *See Burger King Corp. v. Macshara*, 724 F.2d 1505, 1508 (11th Cir.1984); *Gold Kist Inc. v. Baskin-Robbins Ice Cream Co.*, 623 F.2d 375, 377 (5th Cir.1980). Georgia's statute provides:

> A court of this state may exercise personal jurisdiction over any nonresident ... as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he were a resident of the state, if in person or through an agent, he:
>
> (1) Transacts any business within this state....

Ga.Code Ann. 9–10–91 (Supp.1983).

The Georgia Supreme Court summarized the reach of the statute as follows:

> Under our Long Arm Statute jurisdiction over a nonresident exists on the basis of transacting business in this state [1] if the nonresident has purposefully

done some act or consummated some transaction in this state, [2] if the cause of action arises from or is connected with such act or transaction, and [3] if the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice.

*Davis Metals, Inc. v. Allen*, 230 Ga. 623, 198 S.E.2d 285, 287 (1973). The *Davis Metals* court recognized the trend to construe "transacting business" liberally and "to uphold the jurisdiction of the court of the plaintiff's residence in actions, arising either directly or indirectly, out of such transactions." 198 S.E.2d at 287–88; *see also Warren v. Warren*, 249 Ga. 130, 287 S.E.2d 524, 525 (1982) ("this court has 'interpreted the long-arm statute liberally' ... —within a long-arm category, such as 'transacts any business,' jurisdiction will be exercised to the extent permitted by procedural due process.").

### A. Defendants' visit to Georgia after execution of the contract to discuss enforcement of the contract

Snyder's and Morosco's visit to Carrollton, Georgia to discuss the April 7 contract in February 1982 is jurisdictionally significant. The district court discounted this meeting because it occurred, the court found, after the contract was entered into and at the behest of Southwire to persuade Metals & Co., Ltd. not to enforce the contract.

The negotiations over enforcement of the contract satisfy the first two prongs of the *Davis Metals* test. The negotiations constitute an act within the forum, and the cause of action arises from or is connected with that act.[1] Although the cause of action does not arise out of the post-contract negotiations, the cause is connected with those negotiations, which is all *Davis Metals* requires. Defendants solicited an alu-

---

1. In *Helicopteros Nacionales de Colombia, S.A. v. Hall*, —— U.S. ——, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), the Supreme Court expressly reserved the questions whether the terms "arising out of" and "related to" (similar to "connected to") describe different connections between a cause of action and the activity in the forum, what sort of tie with the forum is necessary for either relationship to exist, and whether if the

two types differ a cause of action that relates to but does not arise out of defendant's contacts should be analyzed as an assertion of specific as opposed to general jurisdiction. *Id.* at —— n. 10, 104 S.Ct. at 1873 n. 10. In that case the Court held that personal jurisdiction did not exist in Texas over a Colombian helicopter transportation company in a tort action concerning a crash in Peru even though 80% of the

minum sale from Southwire and later consummated an aluminum sale by phone. Differences arose over performance of that contract. Southwire contended that defendants had failed to provide the requisite amount of aluminum and sought to cancel the contract. Southwire's right to cancel was the subject of the visit, for, as the district court found, Southwire attempted "to dissuade the defendants from enforcing the contract." Southwire has now sued defendants seeking cancellation and relief from the contract, the subject matter of the visit and discussion in Georgia. The suit is sufficiently connected to defendants' activities within the forum to justify the exercise of jurisdiction. This analysis is consistent with *Porter v. Mid-State Homes, Inc.*, 133 Ga.App. 706, 213 S.E.2d 10 (1975), where the court held that the purchase of advertising space in a newspaper, though not directly related to a suit arising out of foreclosure of land, was sufficiently "connected with" the plaintiff's claim to furnish transaction of business to support jurisdiction.

In *O.N. Jonas Co. v. B & P Sales Corp.*, 232 Ga. 256, 206 S.E.2d 437, 438 (1974), a Georgia manufacturer fabricated goods and sold them to a nonresident. The nonresident's agents visited the plant in Georgia, but no negotiations took place. The goods were ordered later by mail and telephone and shipped F.O.B. shipping point. No contracts were executed in Georgia. The Georgia resident argued that the nonresident's mere visit to Georgia was sufficient to create transaction of business. The supreme court held this visit insufficient but emphasized that "there were *no negotiations* or contracts entered into in Georgia with respect to the goods that are the subject matter of these actions." 206 S.E.2d at 439 (emphasis added).

Later cases in the Georgia Court of Appeals show that both pre-contract and post-

contract negotiations constitute the transaction of business and allow suit on the contract. In *Delta Equities, Inc. v. Larwin Mortgage Investors*, 133 Ga.App. 382, 211 S.E.2d 9 (1974), agents of the defendant came to Georgia to negotiate a contract. The court found transaction of business sufficient to invoke long arm jurisdiction:

Appellee's agents made two visits to Georgia to negotiate a contract. We harbor no question but that such negotiations constitute a significant contact in Georgia and are significant factors to be considered in determining whether appellee is subject to this state's jurisdiction. Accordingly, we hold that the negotiations within the confines of this state constituted the required "minimum contacts" necessary to hold that appellee was "transacting business" within the intent of Georgia's Long Arm Statute . . . .

211 S.E.2d at 11.

Finally, in *Shea/Rustin, Inc. v. Home Fashion Guild Ltd.*, 135 Ga.App. 88, 217 S.E.2d 405, 407 (1975), the court of appeals indicated that negotiations in Georgia after the execution of the contract sued upon, even though the contract was executed and negotiated outside of Georgia, were sufficient to subject the nonresident to jurisdiction in Georgia courts. Plaintiff and defendant had agreed that defendant would "organize, prepare and print certain advertising campaigns for the appellee." Negotiations began in New York, the agreement was made in New York, and the New York defendant had no employees, officers or agents in Georgia. 217 S.E.2d at 406. This overall contract had already been entered into and performance begun when the agent visited Georgia because the agent was supervising the production of his "job." *Id.* The agent came to Georgia " 'to further personally discuss with

helicopter fleet was purchased in Texas, $5 million paid by its Texas client was drawn on a Texas bank, and numerous other contacts with Texas existed. Plaintiffs did not argue that even if the cause of action from the crash did not "arise out of" defendant's activities in Texas it was "related to" the Texas activities of defend-

ant. In that case plaintiffs attempted to use contractual undertakings in Texas as the basis for a tort suit on a crash occurring in Peru. In the present action, on the other hand, defendants' contractual activities in Georgia provide the basis for suit on the contract, not some other tangentially related occurrence.

Shea/Rustin, Inc. personnel the production details regarding said job,'" and supervise some of the work underway on the contract. The court held that the negotiations within Georgia constituted transacting business within the intent of Georgia's long arm statute.[2] *Id.* at 407.

Metals & Co., Ltd.'s prior course of sales with Southwire before the contract at issue cannot alone provide sufficient contacts for a suit on this contract because this cause of action does not arise from and is not connected with those prior contracts. *See Davis Metals* (second requirement). Defendants' visit to discuss enforcement of the April 7 agreement in February 1982, however, must be viewed in the context of prior dealings. Neither the visit to Georgia for solicitation of the contract nor the post-contract negotiations occurred in a vacuum. Metals & Co., Ltd. had large sales with Southwire from 1977 forward. Metals & Co., Ltd. sent its agent, Metals, Inc., to Georgia in February 1982 to discuss enforcement of an existing contract with a steady client. These negotiations fell within the liberal definition of transacting business, and although the suit seeking cancellation does not "arise from" these negotiations, the suit is connected with them, which is all *Davis Metals* requires. Thus even without the benefit of *Shea/Rustin*, we believe that a trip to Georgia to discuss enforcement of a contract with a client to which one had already sold a large volume of metals, when considered with the prior visit and extensive sales to Southwire, constitutes transacting business and is sufficiently connected with a suit on the contract discussed to confer jurisdiction under the *Davis Metals* test.

### B. The February 1981 visit to Georgia to solicit metal sales

The district court discounted Huff's February 1981 visit to Southwire's facility to solicit aluminum sales because, the court found, the parties discussed scrap aluminum and not primary aluminum (the subject of the eventual contract). The court viewed the significance of this visit too restrictively.

In *Brooks Shoe Manufacturing, Inc. v. Byrd,* 144 Ga.App. 431, 241 S.E.2d 299 (1977), a terminated sales representative sued his employer, Brooks, in Georgia. The salesman had worked in Georgia, and prior to the termination executives of Brooks had come to trade shows in Georgia once a year for three years to assist the salesman in soliciting customers. The salesman alleged breach of contract, interference with his business relations, and conversion of customer lists. Officers of Brooks came to these trade shows "to encourage the development of defendant's market in Georgia and to reap economic benefit therefrom." 241 S.E.2d at 301. The cause of action apparently did not arise directly from these visits, though the court does not specifically discuss the relatedness issue. On these facts the court held that Brooks had transacted business and was subject to the jurisdiction of Georgia courts for suit on the salesman's claims. *Id.*

Applying *Brooks* to this case, we see an even stronger case for upholding jurisdiction. The district court found defendants' earlier trip was to discuss scrap aluminum. Southwire's order, two months later, was for primary aluminum. The difference in form of the aluminum does not determine the jurisdictional significance of the visit. Metals & Co., Ltd., through Metals, Inc., trades in metal, including aluminum. Defendants have made numerous contracts with Southwire for aluminum and other metals. Their agents came to Georgia in

---

**2.** While in Georgia the parties executed a purchase order tying down some of the cost details of the job. This purchase order was apparently not the contract sued upon since plaintiff sued on the broader original contract "to organize, prepare and print certain advertising campaigns for the appellee." 217 S.E.2d at 406. This purchase order setting out certain cost details was thus a tying down of loose ends left open in the New York agreement sued upon. Professor Ellington and Dean Beaird in their annual survey of Georgia law share this construction. *See* Beaird & Ellington, *Trial Practice and Procedure, Annual Survey of Georgia Law,* 28 Mercer L.Rev. 257, 258 (1976) ("supplementary agreement concerning certain cost details").

February 1981 to talk to Southwire about selling aluminum. Two months later they sold aluminum to Southwire. They have availed themselves of the economic benefit of the aluminum trade in Georgia.

Moreover, under the pure *Davis Metals* test quoted above, the February 1981 visit, when considered with the post-contract visit and prior extensive sales to Southwire, was sufficient to meet the transaction of business requirement. The cause of action need only arise from or "be connected with" the act or transaction in the forum. Here even if the cause of action did not "arise" from the prior visit and negotiation regarding scrap aluminum, the cause of action is sufficiently "connected with" that negotiation and solicitation to confer jurisdiction. That is, a representative of Metals & Co., Ltd. came to Georgia to solicit an aluminum sale from Southwire, and an aluminum order shortly appeared (albeit for a somewhat different type). Southwire now seeks cancellation of the agreement because of defendants' alleged failure to perform the order that developed from the solicitation.

III. Procedural due process and fairness under *Davis Metals*

Defendants argue for a restrictive interpretation of Georgia's long arm statute. As noted above, the Georgia courts have opted for a liberal one. The statute extends to the limits of procedural due process. The third prong of the *Davis Metals* test incorporates this constitutional requirement: "if the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice." 198 S.E.2d at 287. As the Georgia courts have recognized, however, affirmative answers to the first two prongs of the *Davis Metals* test frequently ipso facto constitute the type of minimum contacts and purposeful availment required by *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), and its progeny. *See Shellenberger v. Tanner,* 138 Ga.App. 399, 227 S.E.2d 266, 274 (1976).

Under the facts of this case the two metals companies had sufficient minimum contacts under *International Shoe* and its progeny to render them subject to the jurisdiction of Georgia courts for suit on the contract. The combined acts of defendants in Georgia more than satisfy the constitutional requirement "that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958) (citing *International Shoe,* 326 U.S. at 319, 66 S.Ct. at 159); *see Burger King,* 724 F.2d at 1508–10. Sufficient contacts exist between Georgia, defendants, and the cause of action that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *See Shaffer v. Heitner,* 433 U.S. 186, 203, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977); *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158. The fairness of requiring defendants to answer in Georgia courts for their metal dealings there satisfies both the Constitution and the final prong of the *Davis Metals* inquiry.

REVERSED.