COMPLETE CONCEPTS, LTD., Plaintiff–Counter Defendant–Appellee,

v.

GENERAL HANDBAG CORPORATION, a/k/a General Handbag, Inc., Defendant–Counter Claimant–Appellant.

No. 88–8606.

United States Court of Appeals, Eleventh Circuit.

Aug. 10, 1989.

Harold T. Daniel, Webb & Daniel, William C. Gentry, Atlanta, Ga., for defendant-counter-claimant, appellant.

Harvey D. Harkness, Maley, Wilensky, Cohen, Wittner & Kessler, Susan L. Howick, Atlanta, Ga., for plaintiff-counter defendant-appellee.

Before KRAVITCH and CLARK, Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

In this appeal of a breach of contract action we are confronted primarily with two issues: whether the district court had jurisdiction over the appellant and the speculative nature of the appellee's proof of its damages for lost commissions. We consider these and other issues and affirm in part, reverse in part and remand with instructions.

Organized as a holding company in 1983, the plaintiff-appellee Complete Concepts, Ltd. (Complete) is a Georgia corporation owning a number of subsidiaries which market and manufacture ladies handbags. Complete's wholly owned subsidiary McCrackin Industries, Inc. (McCrackin), also a Georgia corporation, produces leather handbags under the trademark of "Stone Mountain" and has registered other trademarks as well, including "Smoke Valley."

General Handbag Corporation (General), the defendant-appellant, is a Florida corporation and former manufacturer of ladies handbags. Initially incorporated in the 1960s by Murray Resnick, president of long-time handbag makers Julius Resnick, Inc., New York and Julius Resnick Florida, Inc. (collectively, J.R. Handbags), General remained inactive until 1983. In that year, Resnick began implementing a plan to start up a new handbag plant.

In late 1983, Resnick invited Jack Lieberman, an Atlanta-based sales representative for Stone Mountain, to Miami to discuss the

marketing of General's handbags. Lieberman accepted Resnick's invitation and was accompanied on the trip by Kenneth Orr, Complete's vice president. The following afternoon Orr visited Resnick at J.R. Handbags' factory. The two discussed the feasibility of General producing leather handbags designed by Complete to compete with imported merchandise retailing in the range of $50.00–$70.00. As the lengthy conversation came to a close, Resnick announced that he wanted to go through with the deal.

Shortly thereafter, General borrowed $500,000.00, a loan personally guaranteed by Resnick, to establish a manufacturing facility. Within a few months, the new factory was ready. Thus, early in 1984, Resnick and Orr resumed negotiating the details of the contemplated manufacturing and marketing operation, meeting in either New York or Miami. At some point, Resnick and Earnest Bentley, General's president, traveled to Atlanta to tour Complete's factory in Conley, Georgia and discuss the proposed agreement with David Hauck, Complete's president. Bargaining in Georgia, the company's principals conferred over the raw materials required for the medium-priced handbags—which were to be marketed under the trademark "Smoke Valley"—the ornaments for Smoke Valley, and general marketing and merchandising concepts.

By March, the parties reached an agreement. A letter addressed to Resnick, signed by Hauck and dated March 7, 1984, purported to memorialize the contract's terms. But Resnick refused to execute this writing on behalf of General,[1] objecting to portions which contradicted his understanding of the antecedent oral agreement. A contract had been made, however, and many of the essential operative terms were not in dispute. Under the uncontested conditions of the contract, Complete agreed to create the styles of handbags to be manufactured by General and to market, merchandise and sell the bags. Complete's right to sell the handbags was exclusive. General, in addition to making the handbags and shipping them to buyers, agreed to cover all costs, including raw materials and labor. Complete assumed no liability for the production of the handbags. General agreed to pay Complete a commission of 10% (later raised by mutual agreement to 15%) of net sales, although at the trial the parties differed as to when the commissions were due[2] and argued over the type of sales on which a 10%, or full, commission was to be paid.[3] Another sharply disputed provision in the March letter was a cancellation clause requiring six months written notice to terminate the agreement. Resnick testified that the parties had never discussed cancellation during the negotiations. Nevertheless, despite some apparent uncertainty concerning the details of the agreement, General made, and Complete marketed, Smoke Valley handbags for nearly two years.

Early in 1985, Complete began negotiating with an unrelated third party, Jaclyn, Inc. (Jaclyn), with a view toward reaching an agreement under which Jaclyn would manufacture handbags bearing another McCrackin trademark, "Saddle River." A budget bag, Saddle River was expected to retail in the $25.00–$50.00 price range.

1. Although the March letter referred to Resnick as the president of General, in fact he was not an officer of the corporation. Resnick, however, held a controlling interest in the company, personally owning a 28% stake and indirectly holding another 28%, the equity position occupied by Resnick's close corporation, Julius Resnick Florida. And, in addition to being on the board of directors, Resnick was in fact the supervising authority, an arrangement acknowledged by the company's titular leader, Earnest Bentley.

2. The March letter, which Complete contended contained the parties' complete agreement, provided that commissions would be paid on the twentieth day of each month following shipment of the handbags. General's position, articulated by Resnick, was that commissions were paid on receipt of cash from the customer, not before.

3. Complete claimed that the full commission was payable on *all* sales unless the parties agreed otherwise beforehand. General asserted that the maximum rate was applied only to normal sales of regular merchandise and was not intended to cover incentive or distress sales.

Thus, Complete intended that Saddle River not compete with the moderately priced Smoke Valley and the upscale Stone Mountain lines but planned instead to penetrate a new market. As 1985 drew to a close, Jaclyn and Complete consummated a deal, and Jaclyn began making Saddle River handbags. The contract between Complete and Jaclyn did not offend Complete's agreement with General, there being no exclusivity provision in the latter.

Trouble in the Smoke Valley operation surfaced in the summer of 1985, when, according to Complete, General ceased making timely commission payments. By December, Resnick sensed that Complete was displeased with General, and, at a meeting in Complete's New York showroom in January or February of 1986, Orr confirmed Resnick's suspicions. Complete's subsequent demands for payment of commissions alleged to be owing went unmet.

Finally, on March 27, 1986, Resnick and Hauck again met in New York City at Complete's showroom to discuss their deteriorated relationship. During the course of the lengthy conversation, Resnick proposed as a solution that Complete acquire General. According to Resnick, Hauck agreed to purchase General for one dollar. R.4–278. The men agreed to meet again on April 1, 1986.

On the appointed date, the parties gathered in New York City, at Complete's offices. Complete insisted that numerous conditions be met prior to the consummation of the contemplated transaction. Specifically, Complete requested the right to review General's audited statements, a guarantee that two key employees, Carlos Salgado and Bentley, would remain with the company and written authorization from the shareholders supporting Resnick's authority to sell General's stock. Also discussed was the necessity for Complete to obtain financing. Resnick insisted that Complete either assume the $500,-000.00 note on which he was personally liable, or retire that debt with other borrowed funds, and he made arrangements for Hauck to meet with General's banker in Miami. Resnick, believing that the parties already had made a "handshake deal" for the purchase of General's stock, expected to close on April 1, 1986. No agreement was reached on that date, however.

On April 9, 1986, Hauck sent a letter of intent to Resnick which contained Complete's version of the proposed stock purchase agreement. Resnick refused to sign this document, objecting to its contents. In a letter dated April 15, 1986 and addressed to Orr, Resnick returned all unfilled orders for Smoke Valley products—about $20,-000.00–$25,000.00 worth by Resnick's estimate. Also, the letter informed Complete that General intended to close down in two weeks.

At Complete's request, the parties met one last time at General's factory in Opa–Locka, Florida. During this meeting, held April 22, 1986, Hauck and Orr stressed their desire to save the Smoke Valley line. Since General would not make the handbags, Orr suggested that Jaclyn manufacture Smoke Valley handbags in Hong Kong using leather earmarked for the Saddle River brand. Orr declined Resnick's offer to send Smoke Valley samples to Jaclyn's Hong Kong factory.

The next day Resnick telephoned Hauck and asked him how Jaclyn's Smoke Valley samples had been made up. Hauck explained that Jaclyn had assembled them about three or four weeks earlier at its New Jersey workshop, and that the samples already had been delivered to the company's overseas factory. Because of the time required to fabricate and ship samples to Hong Kong, Resnick concluded that Complete had intended for some time to replace General with Jaclyn as the maker of Smoke Valley handbags.

In May Complete began notifying customers that Smoke Valley had changed its name to Saddle River. Outstanding Smoke Valley orders were cancelled, and Complete urged buyers to resubmit them as orders for Saddle River. Jaclyn was able to reproduce about 75% of the styles of the basic Smoke Valley line. However, although the bags were identical to the Smoke Valley bags being replaced, the new manufacturer

refused to use the Smoke Valley name, because the trademark had been licensed to General. The first Jaclyn-made, Smoke Valley-style Saddle River handbags were shipped to the United States from Hong Kong in July, 1986.

About three months later, Complete filed a complaint in the United States District Court for the Northern District of Georgia, seeking compensatory and punitive damages for breach of contract, demanding the value of goods and funds advanced on General's account, and asking for an accounting of General's net profits, of which it claimed a share. General denied the material allegations of the complaint and filed a counterclaim for compensatory and punitive damages, alleging a breach by Complete of the stock purchase agreement and a conspiracy between Complete and Jaclyn to terminate the manufacturing and marketing contract.

Complete moved for partial summary judgment on its cause of action for earned but unpaid commissions and on General's counterclaims. The district court granted summary judgment in favor of Complete on General's conspiracy count.

During the trial, the district court denied General's pending motion to dismiss for lack of personal jurisdiction. Also, Complete abandoned its claims for punitive damages and for an accounting and proceeded under a breach of contract theory. General pursued its remaining counterclaim against Complete for breach of the alleged contract to purchase General's stock.

At the close of the evidence, General moved for a directed verdict on the ground that Complete had failed to prove its damages with the specificity required by Georgia law. The district court denied the motion, finding that there was sufficient evidence for the jury to determine and compute the commissions due Complete for past sales, lost sales, certain sales made by General directly to Marshalls, Inc. (Marshalls), a discount department store, and the amount of advances of goods and funds made by Complete on behalf of General. The district court directed a verdict in favor of Complete on General's remaining counterclaim, holding that the parties had not come to a meeting of the minds on the proposed sale of General's stock, and that Resnick did not have authority to negotiate the sale.

The jury returned a verdict in favor of Complete, awarding damages on a special verdict form as follows:

| | |
|---|---|
| (1) 'Earned' past commissions (February through May, 1986) plus raw materials | $100,412.11 |
| (2) 'Lost' future commissions (March through June, 1986) | $100,000.00 |
| (3) Commissions on sale to Marshalls (May and June, 1986) | $ 10,633.24 |
| (4) 'Miscellaneous'—goods and funds advanced for Manufacturer | $ 4,190.87 |
| Total | $215,236.22 |

The district court entered judgment on the verdict and awarded post-judgment interest at the rate of 12%.

General moved for a judgment notwithstanding the verdict or, in the alternative, a new trial, challenging the speculative nature of Complete's proof of the lost commissions, the Marshalls commissions and the goods and funds advanced on General's behalf. General also sought a new trial on its counterclaim for breach of contract and the jury's award on General's claim of set-offs. The district court denied General's motions by order of August 1, 1988, and General appealed.

First, General argues, as it did before the district court, that it was not amenable to service of process under Georgia's long arm statute, asserting lack of sufficient contact with the state to satisfy either the statute or federal procedural due process. Second, General attacks the sufficiency of Complete's evidence of damages for lost sales, primarily on the ground that the proof consisted of speculation and guesswork. General maintains that the district court should have directed a verdict against Complete as to the sums, or granted a new trial or judgment NOV. The appellant objects also to the award of damages in the

miscellaneous category, complaining that the verdict was contrary to the evidence and warranted a new trial. Next, General contends that it raised a genuine issue of fact with respect to its conspiracy counterclaim, making summary judgment inappropriate, and insists that it introduced sufficient evidence that the parties entered into an enforceable agreement for the sale of General's shares to Complete, presenting a jury question which should not have been disposed of by a directed verdict. Finally, General argues that the award of post-judgment interest at the rate of 12% per annum violated 28 U.S.C. § 1961(a) (1982), which provides that interest rates shall be based on the average yield of fifty-two week United States Treasury bills.

■■■■ In a diversity action such as this, a federal court can assert jurisdiction over a non-resident only to the extent permitted by the long arm statute of the forum state. E.g., *Southwire Co. v. Trans-World Metals & Co., Ltd.*, 735 F.2d 440, 442 (11th Cir.1984). Naturally, application of the state law must comport with the United States Constitution. Federal due process protects a non-resident's liberty interest by proscribing the exercise of jurisdiction by a state with which the individual has had no meaningful contact. E.g., *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 2181, 85 L.Ed.2d 528, 540 (1985).

Georgia's long arm statute provides:

A court of this state may exercise personal jurisdiction over any non-resident ... as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he were a resident of the state, if in person or through an agent, he:

(1) Transacts any business within this state....

Ga.Code Ann. § 9–10–91(1) (Supp.1988).[4] The Georgia Supreme Court has "consistently held that [Georgia's] Long–Arm Stat-

ute confers jurisdiction over non-residents to the maximum extent permitted by due process." *First United Bank of Mississippi v. First Nat. Bank of Atlanta*, 255 Ga. 505, 340 S.E.2d 597, 599 (1986). Both the former Fifth Circuit Court of Appeals and this circuit have observed that this section is coterminous with due process. *Southwire*, 735 F.2d at 445; *Gold Kist Inc. v. Baskin–Robbins Ice Cream Co.*, 623 F.2d 375, 378 (5th Cir.1980).

■■■ We are, of course, bound by the Georgia courts' pronouncements on the scope of the state's long arm jurisdiction. E.g., *Gold Kist*, 623 F.2d at 378. However, once we are satisfied that the courts of the forum state have construed their long arm statute into lock-step conformity with the Constitution, the problem reduces to whether the defendant purposefully established "minimum contacts" in the forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' " *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945).

This court has recognized that "[a] meeting in the forum state may constitute 'purposeful availment' if it involves 'significant negotiations of important terms' " as opposed to the execution of a boiler plate contract. *Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.*, 792 F.2d 989, 993 (11th Cir.1986); *Williams Elec. Co., Inc. v. Honeywell, Inc.*, 854 F.2d 389, 392–93 (11th Cir.1988). The Georgia courts have likewise so held. *Shea/Rustin, Inc. v. Home Fashion Guild Ltd.*, 135 Ga.App. 88, 217 S.E.2d 405 (1975); *Delta Equities, Inc. v. Larwin Mortg. Investors*, 133 Ga. App. 382, 211 S.E.2d 9 (1974).

■■■ In the instant case, the record shows that General had no physical ties to Georgia, other than the trip, in early 1984, by Resnick and Bentley to Complete's factory in Conley. In addition to touring the facility, the General officials negotiated

---

**4.** In subsections (2) through (5) the statute provides other grounds for asserting jurisdiction over non-residents, including the commission of a tortious injury within the state, the ownership of real property within the state, or involvement in proceedings as to alimony and child support. In this case, jurisdiction was predicated on the transaction of business clause.

with Hauck over raw materials, ornaments and general marketing concepts. These terms were important, touching subjects at the heart of the deal. Also, the timing of the Conley meeting, which occurred in close proximity to the culmination of the negotiations, makes it significant. Indeed, there is no evidence that any further negotiating took place after the conference in Conley. By this single, calculated visit, General purposefully directed its activities at Complete, deliberately availing itself of the benefits of doing business in Georgia. Furthermore, General intentionally reached out beyond Florida, creating an ongoing business relationship with Complete. See *Burger King*, 471 U.S. at 473, 105 S.Ct. at 2182, 85 L.Ed.2d at 541. Consistent with the terms of the contract, General each month mailed commission checks to Georgia. The regular exchange of orders and commissions between the parties indicates that General's bond with Georgia was neither tenuous nor happenstance. General "should reasonably [have] anticipate[d] being hailed into court" in Georgia. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980). Consequently, having considered pre-contract negotiations, contemplated future consequences, the terms of the contract and the parties' course of dealing, *Burger King*, 471 U.S. at 479, 105 S.Ct. at 2185, 85 L.Ed.2d at 545, we hold that General purposefully established the requisite minimum contacts with the forum. As a result, the district court's exercise of specific *in personam* jurisdiction

over General in this case complied with both the Georgia long arm statute and the due process clause.

General next urges that the damages awarded for lost commissions from March through June, 1986, the commissions on a series of deep discount sales to Marshalls in May and June of 1986 and miscellaneous offsets were based upon speculation and guesswork.[5] Because these damages were not capable of definite ascertainment as required by Georgia law, General argues, Complete failed to meet its burden of proof, and the district court erred in failing to either direct a verdict or enter judgment NOV on these items of damages. General claims additionally that the jury's verdict in favor of Complete for offsets was contrary to the law and the evidence, and consequently that the district court abused its discretion in refusing to order a new trial.

■ In a diversity case, the determination of damages constitutes a substantive issue. *McDermott v. Middle East Carpet Co., Associated*, 811 F.2d 1422, 1426 (11th Cir.1987). Georgia law, therefore, governs the awards in issue. *Id.* Accordingly, we must determine whether, as a matter of Georgia law, the evidence, considered in the light most favorable to Complete, affords substantial support for the damages awarded in its favor. See *United States v. Bucon Const. Co.*, 430 F.2d 420, 423 (5th Cir.1970).[6]

By statute, Georgia law provides that "[r]emote or consequential damages are not recoverable unless they are capable of

---

5. General does not dispute the award of $100,412.11, a figure which appears on General's ledger as a payable to Complete, for commissions earned on shipments from February through May, 1986.

6. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981. In *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969), the former Fifth Circuit Court of Appeals, sitting en banc, formulated the following analytical framework, which we use when reviewing dispositions of motions for directed verdict and judgment NOV:

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

*exact* computation...." Ga.Code Ann. § 13-6-8 (1982) (emphasis added). This rigid rule has been ameliorated somewhat by interpretation, the courts acknowledging that "[d]amages which are the legal and natural result of the breach are not necessarily too remote, merely because they may be to some extent contingent." *Reynolds v. Speer,* 38 Ga.App. 570, 144 S.E. 358, 359 (1928). Thus, although the general rule remains that "unless the lost profits are capable of definite ascertainment, and are traceable directly to the acts of the other party, they are not recoverable," *Tri-State Systems, Inc. v. Village Outlet Stores, Inc.,* 135 Ga.App. 81, 217 S.E.2d 399, 402 (1975), a claimant nonetheless need not "prove its damages to the exact dollar," but rather must "provide some rational basis of computation." *Id.,* 217 S.E.2d at 403. And "[t]hough there should not be reliance upon speculation and conjecture and the proof should be made with all possible specificity, it has been held in countless cases that reasonable certainty is all that is required." *Crankshaw v. Stanley Homes, Inc.,* 131 Ga.App. 840, 207 S.E.2d 241, 243 (1974); *accord, Sam Finley, Inc. v. Barnes,* 147 Ga.App. 432, 249 S.E.2d 147, 148 (1978); *Mizell v. Spires,* 146 Ga.App. 330, 246 S.E.2d 385, 387 (1978).

■ Complete maintains that it was entitled to commissions on orders it solicited during March and April of 1986 for the fall season, orders which were, as a result of General's breach, cancelled. R.3–53–54. Shipment of the fall handbags was scheduled to begin in May and continue through July, 1986. Because General closed its doors in mid-April, no Smoke Valley handbags destined for retail sale in the fall of 1986 were delivered in either May or June. By July, however, Jaclyn-made Saddle River bags began satisfying the demand for Complete's medium-priced fall styles. To recover for these lost commissions, Complete needed to provide a fair and rational method for arriving at an authoritative figure. This required Complete to prove (1) the amount, in dollars, of lost net shipments, (2) the percentage rate or rates to be applied and (3) the amount of expenses or adjustments which would have been deducted by General from total commissions to arrive at commissions due.[7]

■ According to General, Complete fell short of the "definite ascertainment" and "reasonable certainty" standards by failing (1) to separate the uncontested earned commissions (February through May, 1986) from the lost commissions (March through June, 1986), thereby permitting a double recovery; (2) to prove the dollar amount of orders which, although cancelled, were later filled with Jaclyn products, also allowing a double recovery; (3) to prove the correct commission rate; (4) to establish the dollar amount of lost net shipments; and (5) to offer evidence of any expenses in connection with the commissions.

General's first two points do not convince us,[8] but, in our view its remaining attacks

---

7. The numerous monthly commission reports introduced into evidence by General indicate that General computed Complete's commissions as follows: regular, incentive and promotional net sales (that is, the amount, in dollars, of net shipments of each category for a particular month) times the applicable percentages (which differed as to type of sale) less expenses (such as the cost of salesmen's samples, advertising allowances to customers and specific freight and Federal Express charges).

8. The overlap in time between the earned commissions and the lost commissions really is not a problem and is explained by the delay between the dates orders were placed and the scheduled delivery dates. When buyers ordered handbags, they specified a shipping date, which could be a month or later. R.4–269. Indeed, Plaintiff's Exhibit No. 12, General's Open Orders Report prepared February 28, 1986, shows orders taken in October, November and December of 1985 with the shipping dates in March, April and May of 1986. Thus, in February through May of 1986 General continued to ship merchandise, filling orders taken by Complete prior to March, 1986. As a result of these shipments, General each month recorded in its books a commission expense payable to Complete. The total of these earned but unpaid commissions is $100,412.11. In contrast, the lost commissions related to orders for fall styles taken after February, which, but for the breach, would have been shipped beginning in May. Quite clearly the two are unrelated.

The uncertainty surrounding the number of Smoke Valley orders filled with Saddle River handbags might appear to undermine Complete's attempts to prove a reasonably certain

on Complete's proof of lost commissions have merit. General correctly states that a number of different percentage rates for the payment of commissions were used throughout the parties' two-year relationship.[9] Therefore, Complete tried to establish an effective commission rate (the percentage of General's net sales actually received by Complete, as measured over a period of time). Using General's books and records and the actual checks received by Complete, Burton Handmacher, Complete's controller, determined General's net shipments (after customer returns and discounts) and the commissions paid thereon during the months of *February* through June, 1985.[10] This period in 1985 roughly corresponded with the months in 1986 (*March* through June) for which Complete sought lost commissions, and Complete urged that the 1985 numbers were relevant for purposes of comparison. According to Handmacher, General paid Complete a total of $87,043.25 in commissions for February through June, 1985, on net shipments of $1,211,251.00. R.4–202–03. Dividing the smaller figure by the larger one, Handmacher calculated that General paid an effective rate of 7.2% of net sales during those five months.

Handmacher then explained that General's net sales for March through June of 1985 totalled $940,405.00. Because this period corresponded with the relevant period in 1986, Complete offered the 1985 sales figure—$940,405.00—as a reasonable estimate of the net shipments lost in March through June of 1986. Handmacher next applied commission rates of 7.2%, 12.1%,[11] 12.5% and 15% to $940,405.00, obtaining the following results: $67,709.00; $113,789.00; $117,550.00; and $141,061.00, respectively. Based upon these calculations, Complete submitted that its damages for lost commissions fell within the range of $67,709.00 to $141,061.00

Handmacher's testimony did not establish Complete's lost commissions with reasonable certainty for two reasons. First, Complete's "shotgun" approach to proving the commission rate, while achieving a wide spread of estimated lost commissions, failed to target any specific figure(s) for the correct commission rate(s) which were supported by the evidence. The record shows that General *never* paid a flat rate of 12.5% or 15% on *total* net shipments.

Second, and more important, the net sales total for March through June of 1985, $940,405.00 was not a valid comparison with shipments alleged to have been lost in March through June of 1986. The total net sales for those months in 1985 included not only sales corresponding with those lost in 1986, but also included other sales matching the ones actually made in 1986 which gave rise to Complete's claim for a sepa-

figure for lost commissions. However, if Complete mitigated its damages by filling outstanding orders with another supplier's products, the burden was upon General to introduce the amount by which Complete's award should be reduced by such mitigation. See, e.g., *Bigelow–Sanford Carpet Co., Inc. v. Goodroe*, 98 Ga.App. 394, 106 S.E.2d 45, 50 (1958). Because General failed to meet its burden on the mitigation question, its argument is unavailing.

9. Initially, the maximum commission on regular net sales was 10%. In late 1984, by mutual agreement, the commission ceiling was raised to 15%, and General began paying this higher percentage in June, 1985. During the period when the maximum rate was 10%, General paid a 7.5% rate on incentive sales, and 0%, 2% and 5% on promotional sales. The commissions on incentive and promotional sales were increased to 12.5% and 10%, respectively, when the ceiling was raised to 15%.

10. Handmacher included February because General had paid the February, 1985, commission together with the commissions for the subsequent four months, spreading the payment over three checks. Handmacher thus was unable to differentiate the February commission from those for March through June, 1985. R.4–218.

11. Handmacher arrived at this figure by subtracting from 15% the difference between 10% and 7.2%, reasoning that the real rate where the ceiling was 15% would correspondingly differ by about three points. Assuming arguendo that this reasoning was sound, Handmacher nonetheless failed to adjust for the fact that a 15% ceiling was used in June, 1985, thus marginally inflating the 7.2% figure, which obviously would have been lower had the ceiling in June, 1985 remained at 10%. Thus, using Handmacher's methodology, the 12.1% rate should have been somewhat lower.

rate item of damages—its commissions already earned, about which there is no real dispute. In other words, all things being equal, an assumption underlying Handmacher's analysis, $940,405.00 was too generous an estimate of General's lost 1986 sales, because it was padded with sales which were being accounted for independently. Thus $940,405.00 was not a reasonable appraisal of General's lost sales for 1986, and using it as such could have resulted in an unauthorized double recovery for Complete. In sum, Handmacher's testimony confused the commission rate issue and did not reasonably demonstrate a figure for lost 1986 net shipments.

Nor did Complete's other evidence prove with reasonable certainty the amount of net shipments which General would have made but for the breach. Complete did put on evidence of the amount of unfilled orders, offering numbers ranging from $700,-000.00+ [12] to $800,000.00+ [13] to $812,-676.00.[14] However, Resnick's uncontradicted testimony established that some percentage of orders taken were not filled, either because the buyer subsequently cancelled, R.4–269, or General denied credit to the buyer, R.4–270–71. Also, the dollar amount of shipments further would be reduced by customer returns and discounts. R.4–203. To prevent a speculative recovery, Complete needed to provide the jury with a rational basis for reducing orders to net shipments. This it did not do.

Finally, Complete did not prove any of the expenses it would have shared with General in connection with the shipments which were not made.[15] General regularly deducted from total commissions certain costs, including advertising allowances, samples and freight charges. The jury could not reasonably compute lost commissions due without some evidence of these expenses. Complete did not sustain its burden of proof on this issue. See *Comtrol, Inc. v. H–K Corp.*, 134 Ga.App. 349, 214 S.E.2d 588, 591 (1975).

We conclude that Complete failed to establish its claim for lost commissions with the certainty required under Georgia law. The district court, therefore, erred in entering a judgment on the verdict. Accordingly, the award of damages for lost commissions must be reversed, and the total amount reduced accordingly.

■ We find ample support in the record for the remaining items of damages found by the jury, the commission on the sales to Marshalls and the miscellaneous amounts, and we affirm these awards. The sales to Marshalls, made by General in May and June of 1986, were of close-outs consisting of defective merchandise and seconds. For these handbags, Marshalls paid a total of $212,664.70. General contends that the conflicting evidence of the commission rate on such promotional sales left the jury with no rational basis for computing the commission due. As indicated by General's commission reports, Complete had accepted commissions of 0%, 2%, 5%, 7% and 10% on promotional sales. Contrary to prior similar transactions, however, a commission on the sale in issue was not negotiated in advance, nor approved by Complete. To

---

**12.** Adams' estimate. R.5–407.

**13.** Hauck's estimate. R.3–122.

**14.** Orr's estimate. R.3–56. This seemingly hard figure actually was pretty soft. Orr computed this sum by adding the dollar amounts of orders shown in Plaintiff's Exhibit No. 11, Complete's lists of orders received. These handwritten lists, many of which are undated, contain the records of Complete's sales personnel of orders received. Based upon these lists, Orr calculated that Complete would have earned a commission of $103,032.00 had the orders been filled. As will be explained in the text *infra,* his methodology was flawed, because he applied the commission rates to *orders,* rather than to anticipated *net sales.* In addition, he failed to reduce the resulting figure by the amount General would have deducted for expenses, see text *infra.*

**15.** Handmacher's effective commission rate, 7.2%, reflected such expenses, because it was the ratio of commissions actually paid to net dollar shipments. But because Complete did not provide a method for determining net shipments, this effective rate was not helpful. Had net shipments been proved, then lost commissions could have been computed by multiplying an effective commission rate times net dollar shipments. Using that formula, no additional adjustment for expenses would have been necessary.

resolve the disagreement as to the correct commission rate, the jury selected the median, 5%, and awarded $10,633.23, and this it was entitled to do. With respect to the offsets, both sides presented evidence on miscellaneous sums expended on behalf of the other. After hearing the testimony and sifting through the invoices and other documents admitted into evidence, the jury determined that General owed Complete $4,190.87. The evidence being reasonably specific, we will not upset this award. In addition, we hold that the district court did not abuse its discretion in refusing to grant a new trial on the offsetting miscellaneous claims.

The controversy surrounding General's counterclaims focuses on two issues. General claims first that the district court erred in granting summary judgment to Complete on the civil conspiracy count, the gravamen of which is General's allegation that Complete and Jaclyn conspired to have Jaclyn replace General as the manufacturer of Smoke Valley handbags. General theorizes that this conspiracy began as early as 1985 when Complete and Jaclyn entered into the agreement under which Jaclyn produced the lower-priced Saddle River bags. According to General, Jaclyn wanted Complete to "eliminate" General, and Resnick testified that Hauck had revealed to him that Jaclyn's president had called Complete "every day" about making the bags, so desirous was Jaclyn of the Smoke Valley account. R. 4–292.

As circumstantial evidence of a conspiracy, General points to Resnick's "gut feeling" that Complete and Jaclyn had agreed to oust General prior to Resnick's announcement that General would shut down, the conclusion Resnick made after learning that Jaclyn's Hong Kong factory already had sewed Smoke Valley samples by the time of the April 22, 1986, south Florida meeting. Also, General heavily relies upon an April 14, 1986, letter from Robert Chestnov, executive vice president of Jaclyn, to Orr in which Chestnov wrote, "I want you to know that we also want this [Smoke Valley] business, and ... we are prepared to make it work." Defendant's Exhibit No. 14.

We review de novo a grant of summary judgment, applying the same standard as the district court. *Thrasher v. State Farm Fire & Cas. Co.*, 734 F.2d 637, 638 (11th Cir.1984). Thus, we must decide whether the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." R. 56(c), Fed.R.Civ.P.

■ We agree with the district court that General's proof is much too slender to support such a weighty charge as conspiracy. First, the Saddle River deal did not violate the agreement between Complete and General, because their contract did not prohibit the parties from pursuing similar business arrangements with other partners. Second, the letter cited by General as a "smoking gun" mentioned only the *possibility* of Jaclyn making Smoke Valley bags, and it acknowledged that Complete "would prefer to settle [its] problems with Murray [Resnick], as you [Orr] explained to both Allen [Ginsburg, Jaclyn's president] and myself." Finally, Resnick's "gut feeling" is not the stuff from which a logical inference of conspiracy may reasonably be drawn, nor is the evidence that Jaclyn apparently made Smoke Valley samples prior to April 22, 1986, without more, sufficient to raise a jury question that Complete and Jaclyn acted in concert to supplant General. We find that the record discloses not a conspiracy but rather two parties—Jaclyn and Complete—behaving like prudent businesses. Complete, sensing trouble, acted to protect its markets and continue serving its customers, many of whom also were buyers of Complete's in-house brand, Stone Mountain. Jaclyn saw an opportunity to augment its business and informed Complete that if General could not complete its contract, Jaclyn could step up to fill the void. There is no evidence that the game was fixed in advance, and the district court correctly granted summary judgment on the conspiracy count.

■ At the close of the evidence, the district court directed a verdict in favor of Complete on General's second counterclaim, alleging breach of the purported

stock purchase agreement. The district court granted Complete's motion because (1) Resnick lacked authority to enter into a contract to sell General, and (2) there had been no meeting of the minds. In Georgia, a valid contract requires both capacity or ability to enter into a contract, and mutual assent of the parties to the contract's terms. Ga.Code Ann. § 13–3–1, 13–3–2 (1982). The essence of mutual assent is the meeting of the minds of the parties, *Taylor Lumber Co. v. Clark Lumber Co.*, 33 Ga.App. 815, 127 S.E. 905, 906 (1925), and both parties must concur in all terms of the proposed contract, agreeing to the same thing in the same sense. *Associated Mutuals, Inc. v. Pope Lumber Co.*, 200 Ga. 487, 37 S.E.2d 393, 398 (1946).

 We hold that the district court correctly determined that there had been no meeting of the minds. The dialogue between Hauck and Resnick—as recounted by Resnick himself, R.4–278—does not indicate mutual assent to any terms. Indeed, one seemingly significant term—the assumption of the $500,000.00 note—was not even mentioned. In reviewing the grant of a motion for directed verdict, our inquiry is whether "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict." See *supra*, n. 6. The evidence strongly supports the court's finding that Hauck never assented to the terms of the contract, and for that reason, we affirm the directed verdict in Complete's favor.[16]

 Finally, General contends that the district court erred in not adhering to the formula articulated in 28 U.S.C. § 1961(a)[17] in determining post-judgment interest. The 12% rate which the district court awarded is, according to General, higher than the Treasury bill rate provided for in § 1961. General thus seeks a remand for the court to recalculate the post-judgment

interest pursuant to federal, rather than state, law. *G.M. Brod & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1542 (11th Cir.1985). Although General would have us take judicial notice of the proper rate, we think that is a matter best left to the district court, if the 12% rate is in fact not in compliance with the statute.

In summary, (1) we affirm the district court's exercise of personal jurisdiction over General pursuant to the Georgia long arm statute; (2) we affirm the jury's award of damages to Complete with the exception of the award for lost future commissions, which is reversed, and we instruct the district court to enter judgment in favor of Complete in the amount of $115,236.22; (3) the district court's dispositions of General's counterclaim are affirmed; and (4) the district court is instructed to recalculate the interest on the judgment in accordance with 28 U.S.C. § 1961.

AFFIRMED in part, REVERSED in part and REMANDED with instructions.

---

**16.** We need not rule on whether Resnick possessed the requisite authority to contract on behalf of General and express no opinion on that subject.

**17.** The section provides that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the

coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment."