**ALLEGIANT PHYSICIANS SERVICES, INC. (formerly known as Premier Anesthesia, Inc.), Plaintiff,**

v.

**STURDY MEMORIAL HOSPITAL, a Massachusetts Non–Profit Corp.; Rosemary Durnan, M.D.; Kristen Allenson, M.D.; Laima Pauliukonis, M.D.; Susan Pollan, M.D.; Karen A. Spletzer, M.D.; Eileen Dunlap, CRNA; and Uttara Bhimani, M.D., Defendants.**

No. 1:95–CV–1741–FMH.

United States District Court, N.D. Georgia, Atlanta Division.

April 15, 1996.

Carroll Lewis Wagner, Jr., Gary M. Lisker, Michael Scott French, Lawrence J. Bracken II, Hunton & Williams, Atlanta, GA, for plaintiff.

Thomas Alan Cox, Cecil Francis Whitaker III, Sutherland Asbill & Brennan, Atlanta, GA, Mark D. Cahill, Choate Hall & Stewart, Boston, MA, Elmer A. Simpson Jr., Powell Goldstein Frazer & Murphy, Atlanta, GA, for defendants.

## ORDER

HULL, District Judge.

This diversity action is before the Court on Defendants' Motion to Dismiss for lack of personal jurisdiction [6–1].

### I. FACTS

Plaintiff is a Delaware Corporation that provides anesthesia services to hospitals and physicians' groups throughout the United States and has its principal place of business in Atlanta, Georgia. Since May 24, 1991, Plaintiff has been registered to do business in Massachusetts and, as of February, 1995, has maintained a regional office in North Dartmouth, Massachusetts.

Defendant Sturdy Memorial Hospital (the "Hospital") is a Massachusetts non-profit corporation with its principal place of business in Attleboro, Massachusetts. Defendant Hospital operates a satellite health center in Mansfield, Massachusetts, which is close to Attleboro. Defendant Hospital does not have any offices in Georgia and conducts no business in Georgia. Defendant physicians are residents of either Massachusetts or Rhode Island and all work for Defendant Hospital. Defendants Durnan, Allenson, Pauliukonis, Pollan, Spletzer, and Bhimani are all medical doctors licensed to practice in Massachusetts. Defendant Dunlap is a certified registered nurse anesthetist licensed to

practice in Massachusetts. None of the individual Defendants has ever been licensed to practice in Georgia.

## A. *PLAINTIFF CONTACTED DEFENDANT HOSPITAL*

As part of its regular direct mail marketing effort to numerous hospitals, Plaintiff publishes and distributes a bimonthly newsletter called "Business & Medicine Today." Included in the newsletter are business reply cards for readers seeking more information about Plaintiff and its services. In early 1990, Plaintiff received one of these business reply cards from Dr. Richard Shea of Defendant Hospital, requesting additional information about Plaintiff's services. In response, one of Plaintiff's employees contacted Dr. Shea to discuss Plaintiff's services and Defendant Hospital's anesthesia needs. At Dr. Shea's request, Plaintiff sent him an information package that included a brochure, past issues of Business & Medicine Today, and a questionnaire.

Several months later, Plaintiff received the completed questionnaire from Dr. Shea. In January, 1991, Plaintiff sent Dr. Shea a letter regarding Plaintiff's provision of anesthesiology services to Defendant Hospital.

Between January and March, 1991, Plaintiff and Defendant Hospital negotiated the details of an anesthesiology agreement (the "Anesthesiology Agreement"). These negotiations were conducted by phone, by mail, and during in-person meetings between Defendant Hospital and Plaintiff's representative at Defendant Hospital in Massachusetts.

Defendant Hospital's attorneys drafted the Anesthesiology Agreement in Massachusetts and sent it to Plaintiff's offices in Atlanta, Georgia for review and approval. After more negotiations, Plaintiff signed the Anesthesiology Agreement on March 4, 1991. On March 6, 1991, Plaintiff received an executed copy of the Anesthesiology Agreement from Defendant Hospital.

The Anesthesiology Agreement included a choice of law provision that read in relevant part:

> This Agreement has been executed and delivered in, and shall be interpreted, con-strued, and enforced pursuant to and in accordance with the laws of the Commonwealth of Massachusetts.

(Anesthesiology Agreement, Defendants' exhibit "A" to Shyavitz's affidavit). The Anesthesiology Agreement's original term was for five years, beginning on May 1, 1991.

## B. *DEFENDANT HOSPITAL'S CONNECTION WITH GEORGIA*

Pursuant to the Anesthesiology Agreement, Plaintiff was the exclusive provider of anesthesia and related administrative services at Defendant Hospital. Once a month, Plaintiff sent Defendant Hospital a bill for services rendered, and Defendant Hospital sent Plaintiff a check drawn on a Massachusetts bank. Until February, 1994, Defendant Hospital sent its checks to Atlanta, Georgia; after February, 1994, Defendant Hospital sent its checks to Dayton, Ohio. In addition to the regular monthly billing, the parties communicated with one another on a wide range of topics, including personnel matters, billing questions, staffing requirements, bonuses, medical malpractice premiums, and other issues relating to Plaintiff's management of anesthesiology services at Defendant Hospital. These communications occurred several times a month.

No Hospital employee ever traveled to Georgia in connection with the Anesthesiology Agreement. Defendant Hospital has no affiliation with Georgia: it has never owned or leased property in Georgia, it has no operations in Georgia, it renders no services in Georgia, and it receives no revenue or income from Georgia. The sole contacts between Defendant Hospital and Georgia were telephone and written communications between Defendant Hospital and Plaintiff about matters pertaining to the Anesthesiology Agreement.

## C. *PLAINTIFF'S CONTACT WITH DEFENDANT PHYSICIANS*

To fulfill its obligations under the agreement with Defendant Hospital, Plaintiff hired

permanent and *locum tenens* [1] physicians as needed to fill existing vacancies in the anesthesiology group at the Hospital. Plaintiff conducted its recruiting efforts for permanent and *locum tenens* physicians from its offices in Atlanta, Georgia.

Defendant physicians were all permanent physicians hired to work exclusively at Defendant Hospital in Massachusetts. Each permanent physician signed a professional service contract, also referred to as a physicians retention agreement, to serve as an independent contractor with an entity called "Premier Anesthesia of Attleboro." Defendant Hospital is located in Attleboro, Massachusetts. The text of the service contracts explains that "Premier Anesthesia of Attleboro" is the assignee of Plaintiff's rights and duties under the Anesthesiology Agreement. Though not clear in the record, "Premier Anesthesia of Attleboro" appears to be a professional corporation under the control of Plaintiff.

From its offices in Atlanta, Plaintiff also recruited and signed Dr. Pollan to serve as medical director of the anesthesiology at the Hospital. Dr. Pollan replaced Dr. Bhimani, who was serving as acting medical director when the Anesthesiology Agreement was signed. Drs. Pollan and Bhimani both signed contracts with Premier Anesthesia of Attleboro ("P.A.").

As part of its responsibilities to Defendant physicians, P.A. ensured that Defendant physicians were properly trained and certified, and P.A. maintained the Defendant physicians' training and certification throughout the course of the agreement. P.A. also billed and collected for the services performed by the Defendant physicians. According the physician retention agreements, P.A. retained the Defendant physicians exclusively and paid them gross compensation, from which the Defendant physicians were responsible for paying their taxes. P.A. also shared a percentage of the profits it earned from the Defendant physicians' services at the Hospital. P.A. provided the Defendant physicians with supplies and the personnel necessary for the practice of anesthesiology. In return, the Defendant physicians assigned to P.A. all fees earned from their services. Defendant Hospital provided Plaintiff and Defendant physicians the space and the equipment necessary to practice anesthesiology and did not charge Plaintiff, P.A., or the physicians any rent for these benefits.

When the physician retention agreements were signed, the Defendant physicians were living in various states other than Georgia. Defendant Pollan was living in Pennsylvania, Defendant Spletzer was living in Ohio, Defendant Durnan signed one agreement when she lived in Pennsylvania and a second one while living in Rhode Island. Defendants Allenson, Pauliukonis, and Bhimani were residents of Massachusetts when they signed their respective agreements.

From among the Defendant physicians, only Drs. Pollan and Bhimani visited Plaintiff's offices in Georgia. Bhimani visited Plaintiff's offices in Atlanta once, and Pollan visited the offices three times. Other than the visits by Drs. Pollan and Bhimani, all contact between the Defendant physicians occurred over the phone or by written correspondence.

## D. THE LAWSUIT

In a letter dated May 22, 1995, Defendant Hospital terminated the Anesthesiology Agreement effective June 1, 1995, alleging Plaintiff materially breached the Anesthesiology Agreement. In response, Plaintiff brought suit in this Court for Defendant Hospital's allegedly wrongful termination as well as for Defendant Hospital's unwillingness to continue to perform under the Anesthesiology Agreement. After Defendant Hospital ended its participation in the Anesthesiology Agreement, Defendant physicians allegedly continued to perform anesthesia services under an arrangement with Defendant Hospital, in violation of their physician retention agreements. These allegations form the basis for Plaintiff's breach of

---

1. *Locum tenens* physicians are hired on a temporary basis to provide coverage for vacancies on the anesthesiology staff at Defendant Hospital.

contract claims against Defendant physicians.

Plaintiff also alleges tortious interference with contract and civil conspiracy claims against Defendant Hospital and Defendant physicians. According to the Plaintiff, Defendant Hospital and Defendant physicians agreed that Defendant physicians would provide anesthesiology services to Defendant Hospital directly, without any involvement by Plaintiff, prior to Defendant Hospital's termination of the agreement. All Defendants move for dismissal of this action, claiming that the Court is without jurisdiction over their persons.

## II. THE STANDARD OF REVIEW FOR A CHALLENGE TO PERSONAL JURISDICTION

■ Where, as here, an evidentiary hearing is not held, Plaintiff must establish only a *prima facie* case on personal jurisdiction to survive Defendants' Motion to Dismiss. *Francosteel Corp. v. M/V Charm*, 19 F.3d 624, 626 (11th Cir.1994). Plaintiff establishes a *prima facie* case by presenting sufficient evidence to withstand a motion for directed verdict. *Id.* This Court construes the allegations in the Complaint as true, to the extent they are uncontroverted by Defendants' affidavits. *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir.1988). Where the parties' evidence conflicts, the Court construes all reasonable inferences in favor of Plaintiff. *Id.* The facts recounted above observe these guiding principles.

## III. THE COURT'S PERSONAL JURISDICTION

■ "[D]etermination of personal jurisdiction over a nonresident defendant requires a two-part analysis by the federal courts." *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 256 (11th Cir.1996) (quoting *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir.1990)); *Cable/Home Communication v. Network Prod.*, 902 F.2d 829, 855 (11th Cir.1990). First, the Court examines the state long arm statute. *Robinson*, 74 F.3d at 256 (quoting *Madara*, 916 F.2d at 1514). If the statutory text is satisfied, the Court determines whether "sufficient 'minimum contacts' exist to sat-

isfy the Due Process Clause of the Fourteenth Amendment so that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Madara*, 916 F.2d at 1514; *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). Where both jurisdictional hurdles are met, the Court may exert personal jurisdiction over Defendants.

■ Plaintiff alleges claims that sound in tort and contract. This Circuit interprets Georgia's long arm statute as permitting the exercise of personal jurisdiction to the full extent of the Due Process Clause. *Francosteel*, 19 F.3d at 627. If the constitutional requirements are satisfied, then a Georgia court may exercise its jurisdiction over the person. *Id.* There is, however, a developing question over whether the Georgia courts' continue to read Georgia's long arm statute to the full extent of due process or whether the text of Georgia's long arm statute is more restrictive than the Due Process Clause. *Compare Francosteel*, 19 F.3d at 627 ("Georgia's long arm statute confers *in personam* jurisdiction to the maximum extent allowed by the due process clause of the federal Constitution") *with Howell v. Komori America Corp.*, 816 F.Supp. 1547, 1550–1553 (N.D.Ga.1993) (facts in all Eleventh Circuit precedent satisfied text of Georgia's long arm statute; thus, Eleventh Circuit assumed *sub silentio* long arm statute met); *James Whiten Livestock, Inc. v. Western Iowa Farms*, 750 F.Supp. 529, 534–35 (N.D.Ga.1990) (Georgia long arm statute is more restrictive than due process requirements); *Gust v. Flint*, 257 Ga. 129, 356 S.E.2d 513 (1987) (Georgia long arm statute controls exercise of personal jurisdiction by Georgia courts); *Pratt & Whitney Canada v. Sanders*, 218 Ga.App. 1, 460 S.E.2d 94 (1995) (to exercise personal jurisdiction over a non-resident, one of the prongs of the long arm statute must be met), *cert denied*, —— Ga. ——, —— S.E.2d —— (Dec. 1, 1995); *Simplex–Rapid v. Italia Assicurazioni*, 209 Ga.App. 121, 433 S.E.2d 309 (1993) (due process analysis is appropriate only if the defendant committed one of the acts listed in the long arm statute).

■ Despite the growing questions on the proper interpretation of Georgia's long arm statute, the Eleventh Circuit recently affirmed that, at least when considering contract claims, "Georgia's long arm statute confers *in personam* jurisdiction to the maximum extent allowed by the due process clause of the federal Constitution." *Francosteel*, 19 F.3d at 627. Because there have been no Georgia Supreme Court cases to the contrary since the Eleventh Circuit's decision in *Francosteel*, this Court, as a district court in this Circuit, follows the interpretation of Georgia's long arm statute for contract claims as announced in *Francosteel*. The Court further notes that, if due process prevents the exercise of personal jurisdiction over these Defendants, then deciding how to interpret Georgia's long arm statute becomes unnecessary.[2] The Court begins by deciding whether Plaintiff may bring its contract claims against Defendant Hospital in Georgia.

## IV. PLAINTIFF'S CONTRACT CLAIMS

Georgia's long arm statute confers *in personam* jurisdiction to the full extent permitted under the Due Process Clause of the United States Constitution for purposes of deciding whether a non-resident may be sued in Georgia on a contract claim. *Francosteel Corp. v. M/V Charm*, 19 F.3d 624, 627 (11th Cir.1994). Thus, the Court proceeds directly to determine whether the exercise of personal jurisdiction over Defendants comports with due process.[3]

"*In personam* jurisdiction complies with due process when (1) the nonresident defendant has purposefully established minimum contacts with the forum state, and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice." *Francosteel*, 19 F.3d at 627. The minimum contacts contemplated by due process require "the defendant have fair warning that a particular activity may subject him to the jurisdiction of a foreign sovereign." *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 258 (11th Cir.1996) (citations and internal punctuation omitted).

■ To establish minimum contacts for specific jurisdiction so that the non-resident has fair warning, Plaintiff must produce either evidence or uncontroverted allegations that satisfy three criteria. "First, the contacts must be related to the plaintiff's cause of action or have given rise to it." *Id.* (quoting *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir.1993)). "Second, the contacts must involve 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . ., thus invoking the benefits and protections of its laws.'" *Id.* "Third, the defendant's contacts with the forum must be 'such that the defendant should reasonably anticipate being haled into court there.'" *Id.* In sum, "[t]he availability of specific jurisdiction depends on the relationship among the defendant, the forum, and the litigation." *Francosteel*, 19 F.3d at 627.

■ "Once it has been established that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945)). These "other factors" include " 'the burden on the defendant in defending the

---

2. Although not binding on the question of due process, the Court also considers the Georgia courts' decisions on personal jurisdiction so that "any anomalies between the Georgia long arm statute and constitutional due process" are avoided and to ensure consistency with the Georgia courts' exercise of personal jurisdiction. *Electronic Transaction Network v. Katz*, 734 F.Supp. 492, 499 (N.D.Ga.1989); *see also Commercial Cas. Ins. v. BSE Management, Inc.*, 734 F.Supp. 511, 515 (N.D.Ga.1990) (considering Georgia cases to ensure uniformity of application in exercise of personal jurisdiction in Georgia forum).

3. Due process contemplates two varieties of jurisdiction: general and specific. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn. 8, 9, 104 S.Ct. 1868, 1872 nn. 8, 9, 80 L.Ed.2d 404 (1984). The parties agree that specific jurisdiction is the sole basis for this Court to exert *in personam* jurisdiction.

lawsuit, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial systems's interest in obtaining the most efficient resolution of controversies and the shared interest of the states in furthering fundamental social policies.'" *Robinson v. Giarmarco & Bill, P.C.,* 74 F.3d 253, 259 (11th Cir.1996) (quoting *Madara v. Hall,* 916 F.2d 1510, 1516–17 (11th Cir.1990)). " 'Minimum requirements of 'fair play and substantial justice' may defeat the reasonableness of asserting personal jurisdiction even if the defendant has purposefully engaged in forum activities.'" *Robinson,* 74 F.3d at 259 (quoting *Madara,* 916 F.2d at 1516–17). " 'Conversely, these considerations may serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.'" *Id.* The Court turns to its task.

### A. DEFENDANT HOSPITAL'S CONTACTS WITH GEORGIA

■ Applying the three-part minimum contacts test articulated in *Francosteel* and repeated above, the Court initially finds that Defendant Hospital's contacts with Plaintiff, and thus with Georgia, give rise to this cause of action. Defendant Hospital does not maintain any offices or perform any services in Georgia. Instead, the Hospital's sole source of contact with Georgia is the parties' contract for the provision of anesthesiology services in Massachusetts. Because these services and Defendant Hospital's contract with Plaintiff form the basis for this action, the Court concludes that the first prong of the minimum contacts test is met because what contacts exist between Defendant Hospital and Georgia provide the basis for this lawsuit.

The second and third prongs of the minimum contacts test, however, present a more troubling picture. Turning to the questions of whether Defendant Hospital "purposefully availed" itself of the privilege of conducting activities within the forum such that it should "reasonably anticipate being haled" into a Georgia court, the Court finds it did not.

■ As the Supreme Court and this Circuit recognize, a contract with an out-of-state resident is insufficient, standing alone, to establish minimum contacts in that out-of-state forum. *Burger King v. Rudzewicz,* 471 U.S. 462, 478–79, 105 S.Ct. 2174, 2185–86, 85 L.Ed.2d 528 (1985); *Francosteel,* 19 F.3d at 627. Rather, the inquiry into minimum contacts arising from a contractual relationship emphasizes

> a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Francosteel,* 19 F.3d at 627–28 (quoting *Burger King,* 471 U.S. at 478–79, 105 S.Ct. at 2185–86).

#### 1. Plaintiff Initiated Contact with Defendant Hospital

■ In focusing upon the events composing the parties' business relationship, great weight is placed upon who initiated the transaction because "parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities." *Francosteel,* 19 F.3d at 628 (internal punctuation and citations omitted). The courts in this Circuit have found jurisdiction proper where a non-resident reaches out and establishes contact with a Georgia plaintiff. *See, e.g., Complete Concepts, Ltd. v. General Handbag Corp.,* 880 F.2d 382, 389 (11th Cir.1989) (minimum contacts exist where, *inter alia,* Florida defendant reached out and established ongoing business relationship with Georgia plaintiff); *Electronic Transaction Network v. Katz,* 734 F.Supp. 492, 496, 500 (N.D.Ga.1989) (minimum contacts met where, among other things, Florida defendant contacted Georgia plaintiff to be-

gin business relationship); cf. *Sea Lift, Inc. v. Refinadora Costarricense de Petroleo S.A.,* 792 F.2d 989, 994 (11th Cir.1986) (Florida court could not exercise personal jurisdiction over Costa Rican defendant because the "solicitation [did not rise] to the level of purposeful availment"). In contrast to instances where a non-resident defendant contacts a Georgia plaintiff, personal jurisdiction has been found lacking where the Georgia plaintiff contacts the out-of-state defendant. *E.g. General Elec. Credit v. Scott's Furniture Warehouse,* 699 F.Supp. 907, 912 (N.D.Ga. 1988); *Gust v. Flint,* 257 Ga. 129, 356 S.E.2d 513 (1987); *Phears v. Doyne,* 220 Ga.App. 550, 470 S.E.2d 236 (1996).

■ The evidence taken in the light favorable to the non-moving party shows that Plaintiff targeted hospitals around the country with a self-published newsletter that included a business reply card. For all practical purposes, Plaintiff's newsletter is an advertisement proclaiming Plaintiff's services and soliciting a response from Defendant Hospital. Defendant Hospital received several unsolicited promotional brochures and newsletters from Plaintiff before Dr. Shea finally responded to one of Plaintiff's inquiries. After Defendant Hospital responded to one of Plaintiff's repeated solicitations, Plaintiff sent Defendant Hospital additional information, including a questionnaire. Once Dr. Shea returned the questionnaire, Plaintiff sent Defendant Hospital an intent to provide services letter.

Plaintiff contends that Defendant Hospital initiated the contacts between the parties and not Plaintiff. In support of its position, Plaintiff argues (1) that Dr. Shea's return of the business reply card evidences the Hospital's contact with Plaintiff, not vice versa, and (2) Dr. Shea's nine month delay in returning the questionnaire evidences the Hospital's decision to seek out Plaintiff's services or, at least, to purposefully go forward with the business relationship. The Court disagrees with Plaintiff's characterization of the record.

Dr. Shea returned the business reply card in response to Plaintiff's repeated solicitations, i.e. the promotional literature targeted toward Dr. Shea. Thus, the record reveals that Plaintiff, not Defendant Hospital, initiated the contact between the parties, as part of Plaintiff's ongoing efforts to establish business in different parts of the country. Plaintiff's argument that Dr. Shea's nine month delay in returning the questionnaire fares no better.

After returning the business reply card, Dr. Shea received additional materials, including a questionnaire. Nine months later, Plaintiff received the completed questionnaire from Dr. Shea and sent Dr. Shea an intent to provide services letter. Negotiations at Defendant Hospital in Massachusetts ensued and an agreement was finally crafted and signed by Defendant Hospital and Plaintiff. Dr. Shea received the questionnaire in reply to his own response to Plaintiff's initial solicitations. Dr. Shea's delay in returning the questionnaire may evidence a slow period during Plaintiff's courtship of Defendant Hospital or even a certain reticence on Defendant Hospital's part, but it does not support Plaintiff's belief that Defendant Hospital initiated the contact between the parties. For purposes of the minimum contacts analysis, the Court finds that Plaintiff reached out and contacted Defendant Hospital, seeking to expand its anesthesiology services into Massachusetts.[4] The Hospital's communications with Plaintiff were in response to Plaintiff's initial contacts.

2. *Other Factors to Weigh in Determining Personal Jurisdiction*

■ The Court now examines the negotiations between the parties. The evidence demonstrates that all negotiations between Plaintiff and Defendant Hospital occurred in Massachusetts or by telephone and mail, and no representative of Defendant Hospital ventured to Georgia during the negotiations. While physical presence during negotiations is not required before finding that personal jurisdiction over a non-resident is constitu-

**4.** The record reveals that Plaintiff provides anesthesia services to hospitals around the country as well as to other hospitals in Massachusetts. Plaintiff's promotional literature touts Plaintiff as a national provider of anesthesia services that desires to bring its anesthesia services to medical providers throughout the United States.

tional, it remains a relevant factor, particularly where the Georgia plaintiff reaches out to the non-resident defendant. *See, e.g., Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184 (physical presence not necessary where non-resident defendant's efforts are "purposefully directed" toward plaintiff); *General Electric Credit v. Scott's Furniture Warehouse,* 699 F.Supp. 907, 911–13 (N.D.Ga. 1988) (lack of physical presence during negotiations one factor to consider).

Furthermore, the focus of the agreement between Defendant Hospital and Plaintiff was in Massachusetts. Plaintiff's promotional literature explains Plaintiff's desire "[t]o be the premier multi-state anesthesia practice in the U.S." and "to bring[ ] the best of medicine and management to hospital anesthesia departments." (exhibit "B" to Defendants' Reply [11–1].) In following through on its stated purpose, Plaintiff agreed to provide anesthesia services at Defendant Hospital in Massachusetts, and, during the following four years, Plaintiff did just that. As part of its contractual obligations, Plaintiff provided medical doctors to perform anesthesiology at Defendant Hospital in Massachusetts. The Hospital was billed for services performed in Massachusetts. There is no evidence Defendant Hospital was billed for any services performed in Georgia or Defendant Hospital performed any services in Georgia. Rather the entire focus of the parties' business relationship was in Massachusetts. The parties contemplated Plaintiff's providing services in Massachusetts and Defendant Hospital's receiving services in Massachusetts and, in fact, that is what happened.

 Plaintiff points to Defendant Hospital's regular payments to Plaintiff in Georgia as evidence that Defendant Hospital purposefully availed itself of the forum. The Eleventh Circuit, however, places little weight on the mailing of payments to the forum state. *Sea Lift, Inc. v. Refinadora Costarricense de Petroleo S.A.,* 792 F.2d 989, 994 (11th Cir.1986); *General Electric Credit v. Scott's Furniture Warehouse,* 699 F.Supp. 907, 913 (N.D.Ga.1988). Indeed, the fortuity

of where payments are sent is demonstrated in this case because, as of February, 1994, Defendant Hospital sent its payments to Dayton, Ohio. *See General Electric,* 699 F.Supp. at 913 (location where payments are sent is often fortuitous). Similarly, Defendant Hospital's regular phone communications with Plaintiff's offices in Georgia regarding matters relating to the performance of the Anesthesiology Agreement in Massachusetts are insufficient to establish that Defendant Hospital purposefully availed itself of the forum. *General Electric,* 699 F.Supp. at 913.

 The parties also agreed to a choice-of-law provision in drafting the Agreement.[5] While by no means dispositive, a choice of law provision in a contract between the litigants is a factor in deciding whether the parties have " 'purposefully invoked the benefits and protections of a State's laws' " or whether the parties' intended to invoke the benefits and protections of a particular state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 482, 105 S.Ct. 2174, 2187, 85 L.Ed.2d 528 (1985). Here, the parties agreed Massachusetts law would govern any dispute arising from the Agreement. There is no provision for the involvement of Georgia law. The Court concludes that the parties' decision to invoke Massachusetts law, and not Georgia law, weighs against Defendant Hospital's contacts with Georgia.

3. *Plaintiff Argues the Hospital Entered into a Long–Term and Highly Structured Relationship that Subjects It to Jurisdiction in Georgia*

Relying principally upon the Supreme Court's decision in *Burger King v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), to support its belief that Defendants are subject to the jurisdiction of this Court, Plaintiff argues that Defendant Hospital entered into a "a carefully structured relationship that envisioned continuing and wide-reaching contacts with [Plaintiff] in Georgia." (Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, p. 16

---

**5.** The choice-of-law provision also provides that the Agreement was executed and delivered in Massachusetts. The Court considers this in its minimum contacts analysis.

(internal punctuation and citations omitted)). This Court disagrees.

In *Burger King,* the defendant sought out and received a franchiseship from the plaintiff to operate a Burger King restaurant in Michigan. *Burger King,* 471 U.S. at 466–68, 105 S.Ct. at 2178–80. The parties' business relationship soured, and the plaintiff sued in a Florida federal court. *Id.* at 468, 105 S.Ct. at 2179–80.

The Supreme Court held that the Michigan defendant was subject to jurisdiction in Florida. *Id.* at 487, 105 S.Ct. at 2190. In reaching its conclusion, the Supreme Court found that the Michigan defendant "deliberately reached out beyond Michigan" and entered into a "carefully structured 20–year relationship that envisioned continuing and wide-reaching contacts with [the plaintiff] in Florida." *Id.* at 479–80, 105 S.Ct. at 2185–86 (internal punctuation and citations omitted). The Supreme Court also found a choice-of-law provision in the parties' franchise agreement providing for the application of Florida law "reinforce[s] [the Michigan defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Id.* at 482, 105 S.Ct. at 2187.

The facts presented in this case are materially different from the facts before the Supreme Court in *Burger King.* First, this Plaintiff reached out to Defendant Hospital and sought to expand its anesthesiology business into Massachusetts. While Defendant Hospital may have benefitted from contracting with a national organization in the sense that Plaintiff may have greater resources to draw upon than a local anesthesiology group or than Defendant Hospital could provide in-house, Plaintiff sought out this opportunity, not Defendant Hospital, and, thus, the Court concludes that Defendant Hospital's choice of Plaintiff and the accompanying contact with Georgia is fortuitous because Defendant Hospital merely responded to solicitations from an entity looking to expand into Massachusetts. Also in contrast to *Burger King,* the parties' choice-of-law provision favors the application of Massachusetts law, not Georgia law, and specifically provides that the Agreement was delivered and executed in Massachusetts.

Finally and perhaps most telling, Defendant Hospital did not voluntarily accept the "long-term and exacting regulation" of its operations, as the Michigan defendants did in *Burger King. Cf. Burger King,* 471 U.S. at 480, 105 S.Ct. at 2186 (factor in finding minimum contacts established was the Michigan defendant's "voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters . . . ."). Indeed, the record demonstrates just the opposite.

The Anesthesiology Agreement between Defendant Hospital and Plaintiff required Plaintiff to "(I) assure compliance with the requirements . . . of any accrediting organization . . . (ii) comply with all applicable federal, state and local laws and regulations; and (iii) *comply with all applicable Hospital policies.*" (The Agreement, § 3.9 (emphasis added)). The Anesthesiology Agreement also required any physician who was providing services under the Anesthesiology Agreement to "be a member in good standing of the [Hospital's] Medical Staff," and "be approved by the Hospital to provide Services required of [Plaintiff] . . . ." (*Id.* at § 3.1–2). Thus, the Anesthesiology Agreement gave considerable control to Defendant Hospital as to how Plaintiff would provide anesthesiology services.

Plaintiff's role was confined to the discrete task of providing anesthesiology services at Defendant Hospital within the guidelines set by the Hospital. Not only did Defendant Hospital continue to operate in many areas with no involvement by Plaintiff, but, even in the area of anesthesiology, Defendant Hospital retained considerable control over who was authorized to provide services and what standards would govern those services. In no way can Plaintiff's provision of anesthesia services be said to be a "long-term and exacting regulation" of Defendant Hospital's operations or of Defendant Hospital's anesthesiology services.

Plaintiff also cites to an unpublished opinion by Judge Evans of this Court. *Maid Brigade Systems, Inc. v. Carpenter,* No. 93–cv–3000–ODE, 1994 WL 903888 (N.D.Ga.

Aug. 8, 1994). Closely akin to *Burger King*, *Maid Brigade* involves another franchisee-franchisor relationship gone North. In *Maid Brigade*, Judge Evans found minimum contacts existed where the California defendants solicited the Georgia plaintiff for a franchiseship, after learning about the Georgia plaintiff's business from a third-party publication. As part of the franchiseship, the California defendants attended a mandatory five-day training seminar in Georgia and received a slue of materials ranging from letterhead, business cards, and press announcements to Maid Brigade uniforms and cleaning supplies. *Id.* at 4.

The parties in *Maid Brigade* also were subject to two choice-of-law provisions: one in favor of California law and one in favor of Georgia law. In analyzing the impact of these two choice-of-law provisions, Judge Evans wrote, "[v]iewed alone, the California choice-of-law provision in the franchise agreement provides some evidence that the [California defendants] might not reasonably anticipate being haled into court in Georgia." *Id.* at 14. However, the existence of "the California and Georgia choice-of-law provisions tend to balance each other out." *Id.*

Unlike *Maid Brigade*, there is only one choice-of-law provision in this case, and it favors application of Massachusetts law, not application of the forum's law. As explained in this Court's discussion regarding *Burger King*, the facts presented in this record do not support finding that Defendant Hospital accepted Plaintiff's exacting regulation of the Hospital's anesthesia services in Massachusetts. The facts of *Maid Brigade* do not suggest a different conclusion.

Plaintiff moves away from its reliance on franchise-franchisor cases with its citation to *Complete Concepts, Ltd. v. General Handbag Corp.*, 880 F.2d 382 (11th Cir.1989), yet gains no greater support for its argument in this case. In *Complete Concepts*, a Georgia plaintiff sued a Florida defendant after their agreement for the manufacture and sale of handbags fell apart. *Complete Concepts*, 880 F.2d at 385–87. Unlike the facts in this case, the Florida defendant in *Complete Concepts* initiated the contact with the Georgia plaintiff, and, subsequently, the parties entered

into a contract whereby the Florida defendant would make the handbags and ship them to buyers and the Georgia plaintiff would provide the designs for the handbags and market, merchandise, and sell the handbags. *Id.* at 385. In short, the parties in *Complete Concepts* entered into a joint transactional enterprise to design, manufacture, and sell a product, utilizing facilities in Florida and Georgia to carry out their agreement.

In contrast to the relationship developed in *Complete Concepts* where the parties had an ongoing relationship that contemplated activities in both Georgia and Florida, Defendant Hospital and Plaintiff here agreed only for the provision of anesthesia services in Massachusetts. Any activities that Plaintiff conducted from its Georgia headquarters were for the provision of services in Massachusetts and, unlike *Complete Concepts*, were not part of an ongoing transactional relationship where each party contributed to the sale of a product to third parties. Rather, Plaintiff here entered into a service contract, agreeing to provide Defendant Hospital with a specified service at the Hospital's location in Massachusetts. Also, in contrast to *Complete Concepts*, Plaintiff here sought out its contact with the Hospital, not vice versa. *Cf. Complete Concepts*, 880 F.2d at 384 (Florida defendant initiated contact with Georgia plaintiff).

Unlike the three cases discussed above, Judge Moye of this Court considered a factually analogous scenario when he found personal jurisdiction lacking in *General Electric Credit v. Scott's Furniture Warehouse*, 699 F.Supp. 907 (N.D.Ga.1988). In that case, a Georgia plaintiff approached the Alabama defendants and entered into an extended financing agreement. The negotiations preceding the final agreement occurred in Alabama or by telephone and mail. The Alabama defendants never went to Georgia. Some of the individual financing agreements contained provisions calling for the application of Georgia law, while others called for the application of New York law. In holding that the Alabama defendants lacked minimum contacts with Georgia, Judge Moye found (1) that the Georgia plaintiff initiated the relationship, (2) the Alabama defendants

never ventured to Georgia during the negotiations, (3) the Alabama defendants contract with the Georgia plaintiff affected only a portion of their operations, unlike the "extensive regulation and control of the defendant's entire business" in *Burger King*, and (4) the New York and Georgia choice-of-law provisions balanced one another out. *Id.* at 912–13. The court in *General Electric* found that, because the plaintiff initiated the contact with the defendants and the focus of the contract was outside of Georgia, the Alabama defendants "did not *purposefully direct* their activities toward this forum." *Id.* at 914.

The facts presented here weigh even more heavily toward declining personal jurisdiction than those before the court in *General Electric*. As in *General Electric*, Plaintiff here initiated the contact, all events occurred outside of Massachusetts, all negotiations occurred by telephone, mail or during in person meetings in Massachusetts, and no representative of Defendant Hospital ever went to Georgia during negotiations or after the Anesthesiology Agreement was executed. Notably, the choice-of-law clause is in favor of Massachusetts law and there is no competing clause requiring the application of Georgia law. *Cf. General Electric*, 699 F.Supp. at 913 (contracts between the parties contained Georgia and New York choice-of-law clauses). Thus, most, if not all, of the factors in *General Electric* are present here, and the choice-of-law clause in the Anesthesiology Agreement adds its weight against finding personal jurisdiction over Defendant Hospital in Georgia.

While Plaintiff is correct that its relationship with Defendant Hospital is not a "one-shot operation," *e.g.*, *Sea Lift*, 792 F.2d at 994, and involved an ongoing relationship, the Court finds that Plaintiff's agreement to provide anesthesia services to Defendant Hospital in Massachusetts is not the sort of carefully structured and regulated ongoing business relationship presented to the Supreme Court in *Burger King*, to the Eleventh Circuit in *Complete Concepts*, or Judge Evans in *Maid Brigade*. In short, Defendant Hospital's association with Plaintiff for services in Massachusetts is not purposeful

availment such that Defendant Hospital should have anticipated being sued in a Georgia court. *See General Electric*, 699 F.Supp. at 913–15 (ongoing relationship does not equate to purposeful availment where defendant's action do not create "substantial connection" with the forum).

## B. EXERCISE OF JURISDICTION OVER DEFENDANT HOSPITAL DOES NOT COMPORT WITH FAIR PLAY AND SUBSTANTIAL JUSTICE

■ Alternatively, the Court finds that the exercise of personal jurisdiction over Defendant Hospital would be inconsistent with the principles of " 'fair play and substantial justice.' " *See Robinson*, 74 F.3d at 258 (quoting *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184)). While it cannot be said Georgia has no interest in remedying harm to one of its corporate residents, any interest Georgia possesses is tempered by Massachusetts' interest in adjudicating contractual disputes where the entire transaction occurred in Massachusetts, the contract was delivered and executed in Massachusetts, the contract expressly provides for the application of Massachusetts law, and the contractual dispute involves a Massachusetts citizen who was approached by a non-citizen, inquiring about the Massachusetts citizen's interest in entering into a contract to be performed in Massachusetts.

Furthermore, the burden on Defendant Hospital to litigate here is not light. The parties contracted with each other for services to be performed solely in Massachusetts, and the Anesthesiology Agreement reflects the parties' belief that Massachusetts law would govern any dispute arising thereunder. While a Georgia court can apply Massachusetts law, it is far more probable that the parties expected a Massachusetts court to apply Massachusetts law. Unlike Plaintiff, Defendant Hospital does not operate outside of the boundaries of Massachusetts. Rather, Defendant Hospital is a non-profit organization whose work is confined to its home state. It did not reach out, seeking to obtain business in Georgia. In contrast, Plaintiff seeks out business opportunities throughout the United States. When Defen-

dant Hospital was approached by a non-resident offering services, Defendant Hospital accepted. Subjecting Defendant Hospital to suit in a distant forum, even in today's world of modern transportation, is not an inconsiderable burden where Defendant Hospital never sought to operate or act beyond the boundaries of its home state.

Nor does the convenience to Plaintiff in obtaining convenient and effective relief favor finding Georgia as the forum for this litigation. It may be more convenient for Plaintiff to litigate in Georgia, but, given Plaintiff's Massachusetts' office as well as their willingness to do business in Massachusetts and other parts of the country, the Court finds that it is not greatly inconvenient for Plaintiff to sue in Massachusetts. Additionally, there is no suggestion that a Massachusetts federal court would not render relief as effective as any provided by this Court. Most importantly, however, is the recognition that the entire relationship between the parties focused on Massachusetts. It is true that Defendant Hospital sent payments to Georgia and knew that Plaintiff's principal place of business was in Georgia. Nonetheless, Plaintiff solicited Defendant Hospital so that Plaintiff could expand its anesthesiology services. Plaintiff touted its national reputation and ability to perform services anywhere in the United States, including Massachusetts. Requiring Plaintiff to litigate in the places where it seeks to develop business relationships is not overly inconvenient.

Additionally, merely dampening the harm and unfairness to Defendant Hospital through the use of procedural mechanisms such as changing the venue or utilizing choice of law rules does not render constitutional an otherwise unconstitutional exertion of personal jurisdiction. Simply put, subjecting Defendant Hospital to suit in Georgia when the parties' intent and actual dealings focused almost exclusively on Massachusetts does not comport with fair play and substantial justice as contemplated by due process.

### C. SUMMARY OF DEFENDANT HOSPITAL'S MOTION TO DISMISS

Having considered all the evidence presented by the parties and the unrefuted portions of Plaintiff's Complaint, the Court concludes that Defendant Hospital cannot be constitutionally subjected to this Court's jurisdiction. First, the Court holds that Defendant Hospital lacks sufficient contacts with Georgia to render the exercise of personal jurisdiction over it consistent with the minimum requirements of due process. In reaching its conclusion, the Court relies on no one factor, but considers the entire record as presented, including but not limited to (1) Plaintiff initiated the contact with Defendant Hospital and began the parties' relationship, (2) the relationship was always intended to be conducted and, in fact, was conducted in Massachusetts and not Georgia, and (3) the parties intended to invoke the benefits and protections of Massachusetts not Georgia, as evidenced by the choice-of-law clause in the Agreement. Second, the Court concludes that exercise of personal jurisdiction over Defendant Hospital does not comport with fair play and substantial justice, for the reasons outlined in the preceding paragraphs. In sum, the Court finds that it does not have personal jurisdiction over Defendant Hospital. The Court next examines whether exercise of personal jurisdiction over Defendant physicians satisfies due process.

### D. DEFENDANT PHYSICIANS' CONTACTS WITH GEORGIA

■ Defendant physicians are not parties to the Agreement, and they are not Plaintiff's employees. Instead, Defendant physicians are independent contractors who signed a contract to provide anesthesia services at Defendant Hospital in Massachusetts. These contracts were signed by each Defendant physician as one party and by Premier Anesthesia of Attleboro as the other party. Attleboro, Massachusetts is where Defendant Hospital is located.

Plaintiff was not listed as a party to this contract, under either its current name, "Allegiant Physicians Services, Inc." or its former name "Premier Anesthesia, Inc." Although the record is less than clear, "Premier Anesthesia of Attleboro," apparently, was Plaintiff's doing business as

name for its operations at Defendant Hospital in Attleboro, Massachusetts. The face of each Defendant physician's contract states that Premier Anesthesia of Attleboro is the assignee of Plaintiff's rights under the Anesthesiology Agreement between the Hospital and Plaintiff. Regardless of Plaintiff's corporate transformations, the Defendant physicians entered into professional service contracts with "Premier Anesthesia of Attleboro" ("P.A."), an entity to whom Plaintiff assigned its obligations to provide anesthesia services for the Hospital in Attleboro, Massachusetts.

None of the Defendant physicians is or was a Georgia resident. Nor are any of them licensed to practice medicine in Georgia. Additionally, all Defendants performed services for P.A. only at the Hospital in Massachusetts. Each of the Defendant physicians became associated with Plaintiff in a different fashion.[6] Regardless of the individual facts surrounding the physicians' negotiations, they all learned of an opening at the Hospital and contacted Plaintiff in response to Plaintiff's advertisements or after hearing from someone else of the opening at Hospital. Additionally, all negotiations occurred over the telephone, through the mail, or during meetings at Defendant Hospital in Massachusetts, and, with the exceptions of Bhimani and Pollan, none of Defendant physicians ever visited Georgia in connection with their contracts with P.A.

Defendant physicians all entered into contracts with P.A., which, the contracts explain, was Plaintiff's assignee for purposes of hiring physicians and complying with Plaintiff's obligations under the Anesthesiology Agreement.[7] Defendant physicians do not practice in Georgia, and their relationships with Plaintiff involve services to be performed outside of Georgia. Even Defendant Spletzer, who had previously contracted with Plaintiff, had never done any work in Georgia or otherwise been involved with Plaintiff in Georgia.

As independent contractors for P.A., the Defendant physicians received a gross compensation in twelve equal payments. Each Defendant physician was responsible for paying her own taxes. P.A. paid the physicians' medical liability insurance and provided the physicians access to a profit-sharing plan drawn from P.A.'s profits at the Hospital. Defendant physicians did not enjoy profits from Plaintiff's larger pool of profits drawn from its operations nationwide.

■■■ While the professional service contracts entered into between Plaintiff and the various Defendant physicians lack a choice-of-law clause, they were all drafted by Plaintiff and all were signed by Defendant physicians outside of Georgia. Plaintiff argues that each professional service contract was returned to Georgia where it was executed

6. From July 25, 1994 until May 31, 1995, Defendant Allenson was under contract with P.A. to provide anesthesia services at the Hospital. She contacted one of Plaintiff's representatives in the fall of 1993, but was told there were no openings. In February or March 1994, one of Plaintiff's representatives called Allenson and offered her a job at the Hospital.

From October 18, 1993 until May 31, 1995, Defendant Dunlap was under contract with P.A. to provide anesthesia services at the Hospital. Dunlap first learned of the position at the Hospital through a letter sent to her home.

From May 19, 1992 until May 31, 1995, Defendant Pauliukonis was under contract with P.A. to provide anesthesia services at the Hospital. Pauliukonis learned of the position from a friend who had received a letter from Plaintiff advertising an opening.

From August, 1993 until May 31, 1995, Defendant Durnan was under contract with P.A. to perform anesthesia services at the Hospital. She

learned of the opening from Defendant Pollan, who was Durnan's advisor during residency. Durnan later spoke with one of Plaintiff's representatives and was interviewed at the Hospital for the position.

From May 18, 1993 until May 31, 1995, Defendant Spletzer was under contract with P.A. to perform anesthesia services at the Hospital. Prior to entering into a professional services contract with Plaintiff for the Hospital position in Massachusetts, Spletzer worked for five weeks at the Hospital as a *locum tenens* physician. Although not entirely clear, it also appears Spletzer worked at a hospital in Ohio in January, 1993 as a *locum tenens* physician. In October, 1992, Spletzer was first contacted by Plaintiff for a permanent position at the Hospital. She turned the offer down. In January, 1993, she again learned of an opening at the Hospital.

7. Interestingly, Premier Anesthesia of Attleboro listed Massachusetts as its address for purposes of identifying itself to insurance companies.

by Plaintiff. In rebuttal, Defendants emphasize that the contract was between them and an entity known as "Premier Anesthesia of Attleboro," and Plaintiff's machinations with its corporate form should not subject them to jurisdiction in Georgia. The Court need not resolve where the contracts were actually executed because, as the record is presented, the Court concludes that returning the contracts between Premier Anesthesia of Attleboro and the physicians to a purported assignor's address in Georgia, i.e. Plaintiff, is insufficient, based on the contracts alone, to find that Defendant physicians purposefully availed themselves of the benefits and protections of Georgia's laws. Rather, the Court adheres to the admonition of the Supreme Court in *Burger King* and focuses on the entire relationship represented by the contract and where that relationship evolved. *Burger King*, 471 U.S. at 478–79, 105 S.Ct. at 2185–86.

In that vein, the Court notes that none of the Defendant physicians came to Georgia to negotiate the terms of their independent contractor relationships. While the Supreme Court has cautioned against over reliance on a defendant's lack of physical presence in the forum, *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184, the Court finds the Defendant physicians' non-presence to be a factor weighing against the exercise of jurisdiction when considered in the context of the physicians' relationships with Plaintiff: all anesthesia services were to be performed in Massachusetts, the contracting party called itself "Premier Anesthesia of Attleboro," the Defendant physicians had to be approved as staff physicians for the Hospital, they were non-residents and had no connection with Georgia other than agreeing to work in Massachusetts on behalf of an entity calling itself "Premier Anesthesia of Attleboro" that apparently was closely affiliated with a Delaware Corporation with a similar name whose headquarters were in Atlanta, Georgia.

The Court finds that Defendant physicians entered into an independent contractor relationship with Premier Anesthesia of Attleboro, the purported assignee of Plaintiff, agreeing to provide anesthesia services solely at the Hospital in Massachusetts. With the exceptions of Drs. Bhimani and Pollan, none of the Defendant physicians ventured to Georgia during their negotiations or as part of their contracted for duties. Setting aside Drs. Bhimani and Pollan momentarily, the Court concludes that the Defendant physicians lack the minimum contacts with Georgia required by due process.

■ Turning to Drs. Bhimani and Pollan, the Court finds the question of minimum contacts much closer.[8] Both served as medical directors for the anesthesiology department at Defendant Hospital and were Plaintiff's principal on-site liaison with the Hospital. However, Bhimani and Pollan's contractual relationships were with P.A. and not with Plaintiff directly. In addition to providing anesthesia services, the record reveals that the medical director coordinated the task of obtaining temporary anesthesiologists to fill vacancies as well as performing other administrative tasks. Drs. Bhimani and Pollan also journeyed to Georgia on multiple occasions (one visit for Bhimani and three for Pollan) to attend conferences held by Plaintiff for its medical directors from around the country. Although denominated "independent contractors," Drs. Bhimani and Pollan actively facilitated Plaintiff's ability to perform the Anesthesiology Agreement and served in a more involved capacity than the other doctors, who merely contracted to provide anesthesiology services at Defendant Hospital. In all other regards, Drs. Bhimani and Pollan's contacts with Georgia are as lacking as the other Defendant physicians. Thus, the Court must decide whether the additional contacts inherent in Drs. Bhimani and Pollan's roles as medical director are sufficient to establish minimum contacts

8. From April 2, 1991 through May 31, 1995, Defendant Bhimani was under contract with P.A. to perform anesthesia services at the Hospital. Prior to contracting with Plaintiff, Bhimani was a self-employed physician practicing anesthesia at the Hospital. From December 20, 1991 until May 31, 1995, Defendant Pollan was under contract with P.A. to serve as the medical director of the Hospital's Anesthesiology Department. She learned of the opening from a mail advertisement and called Plaintiff. One of Plaintiff's representative's called Pollan back and negotiations began.

where they would otherwise be lacking. The Court concludes that they are not. Drs. Bhimani and Dr. Pollan cannot be said to have purposefully directed their activities toward Georgia. Dr. Bhimani worked at Defendant Hospital before the Anesthesiology Agreement. After the Hospital contracted with Plaintiff for anesthesiology services, Dr. Bhimani was faced with a choice: contract with Plaintiff or lose her job. Given the potential loss of her job, Dr. Bhimani agreed to contract with Plaintiff. All Bhimani's contacts with Georgia derive from her contractual relationship with Plaintiff. Absent her contract with Plaintiff, Bhimani would have no contacts with Georgia. A defendant cannot be said to have purposefully availed herself of a forum where those contacts were the result of the forum plaintiff's overweening bargaining power. *See Burger King,* 471 U.S. at 486, 105 S.Ct. at 2189 ("jurisdiction may not be grounded on a contract whose terms have been obtained through ... overweening bargaining power...." (internal punctuation omitted)). In addition to the reasons outlined in the Court's discussion of the other Defendant physicians, the Court finds that Plaintiff's overweening bargaining power weighs against finding that Bhimani purposefully availed herself of the forum such that she could anticipate being sued in Georgia. The Court examines Pollan's contacts with the forum.

Dr. Pollan has the most contacts of Defendant physicians, but as the Eleventh Circuit recognizes, "[a franchiseship is] a business relationship of more complicated dimensions than that of an employer/employee relationship." *Johnston v. Frank E. Basil, Inc.,* 802 F.2d 418, 420 n. 2 (11th Cir.1986). Although Pollan's duties were more extensive than the other physicians, Dr. Pollan's relationship with Plaintiff approaches nowhere near the intricate involvement seen in the franchise relationships in *Burger King* and *Maid Brigade.* Dr. Pollan's trips to Atlanta occurred well after she entered into a contract with Plaintiff and, as Plaintiff's own affidavits demonstrate, these conferences were voluntary and not mandated by Pollan's contract.

■ Where, as here, a defendant is employed by a plaintiff located in the forum state to perform functions solely in another state, that defendant's three trips to the forum are insufficient to say that she purposefully availed herself of the benefits and protections of the laws of the forum state such that it was reasonably foreseeable that she would be haled into court there. The Court finds that neither Dr. Bhimani nor Dr. Pollan have the minimum contacts with Georgia required by due process. Pollan's additional duties as the medical director in Massachusetts, acting on behalf of Premier Anesthesia, do not demonstrate that she purposefully availed herself of the benefits and laws of Georgia.

**E. ASSERTING PERSONAL JURISDICTION OVER THE DEFENDANT PHYSICIANS DOES NOT COMPORT WITH FAIR PLAY AND SUBSTANTIAL JUSTICE**

■ Alternatively, even if Drs. Bhimani and Pollan have the minimal contacts with Georgia necessary to satisfy due process, the Court finds that exercise of jurisdiction over Drs. Bhimani and Pollan does not comport with fair play and substantial justice. Drs. Bhimani and Pollan were retained solely to perform work in Massachusetts at Defendant Hospital. Neither has any contact with Georgia, except through their contracts with Premier Anesthesia of Attleboro. These contracts were negotiated outside of Georgia. Dr. Bhimani visited Georgia once in relation to her contract, while Dr. Pollan visited Georgia three times for reasons related to her contract with P.A.

Dr. Bhimani worked at Defendant Hospital prior to the Anesthesiology Agreement between Plaintiff and Defendant Hospital. After Defendant Hospital contracted for anesthesia services, Dr. Bhimani was informed that she could either contract with P.A. and continue working at Defendant Hospital or look elsewhere for work. Given her choice, Dr. Bhimani agreed to contract with P.A. Absent her contract with P.A., Dr. Bhimani would not have had any contact with Georgia.

More importantly, the interstate judicial system's interest in obtaining the most effi-

cient resolution of controversies is promoted by litigating all claims in one forum. Stretching to find jurisdiction over Bhimani and Pollan does not further the interstate judicial system's interest in packaging the claims against Defendant Hospital and the other Defendant physicians into one action. All Plaintiff's claims are based upon the same allegations, and the Constitution's interests in fair play and substantial justice weigh against finding personal jurisdiction over Bhimani and Pollan simply because of a few additional contacts with the forum.

Again, Georgia has an interest in ensuring a Delaware corporation that is based in Georgia obtains remedies for harm caused to it, but that interest is not, in and of itself, sufficient to outweigh the gross unfairness in subjecting Drs. Pollan and Bhimani to a lawsuit in Georgia based solely upon their roles as the medical directors of Defendant Hospital's anesthesiology department in Massachusetts and the few voluntary visits they made to Georgia. Instead, fairness and the Court's desire to see substantial justice done weigh in favor of finding no personal jurisdiction. The events here all occurred in Massachusetts. Plaintiff's only basis for bringing suit here is that the alleged actions of Defendants caused harm to Plaintiff where it is headquartered, which in this case is Georgia. Although Plaintiff is entitled to seek whatever relief it is owed, subjecting Defendants Bhimani and Pollan to suit in Georgia when their alleged fellow defendants avoid the burdens of litigating in a distant forum does not comport with fair play and substantial justice. The Court finds that exercising jurisdiction over Drs. Pollan and Bhimani, or any of the Defendant physicians for that matter,[9] does not comport with fair play and substantial justice as required by the Due Process Clause and as articulated by the Supreme Court.[10]

## V. THE TORT CLAIMS

Without deciding whether Georgia's long arm statute extends to the fullest limits of the federal Constitution for tort claims, the Court finds that Plaintiff cannot assert its tort claims against Defendants in Georgia because, as explained in the above text, Defendants lack minimum contacts with Georgia and the exercise of personal jurisdiction over Defendants does not comport with the constitutional understanding of fair play and substantial justice.

## VI. CONCLUSION

Defendants' Motion to Dismiss [6–1] is **GRANTED.** Plaintiff's Complaint is dismissed for lack of personal jurisdiction.

**SO ORDERED.**

---

**9.** As an alternative holding and for the reasons outlined above, the Court finds exercising jurisdiction over Defendants Allenson, Dunlap, Pauliukonis, Durnan, and Spletzer also does not comport with the constitutional understanding of fair play and substantial justice.

**10.** In opposing Defendants' Motion to Dismiss, Plaintiff did not ask the Court to transfer this case to a forum where personal jurisdiction would be appropriate. 28 U.S.C. § 1406. Nonetheless, the Court notes that, even assuming personal jurisdiction is proper over the named Defendants in Georgia, several factors lean heavily toward a transfer of venue to Massachusetts pursuant to 28 U.S.C. § 1404.